THE STATE OF NEVADA, ON THE RELATION OF
CULINARY WORKERS UNION, LOCAL NO. 226,
ALLEN SHORR, AKA JOHN DOE I AND VIVIAN
SHORE, AKA JANE DOE I, RELATORS, *v.*
EIGHTH JUDICIAL DISTRICT COURT OF THE
STATE OF NEVADA, IN AND FOR THE COUNTY OF
CLARK, AND THE HONORABLE A. S. HENDER-
SON, JUDGE OF DEPARTMENT NO. 2, THEREOF,
RESPONDENTS.

No. 3561

June 24, 1949. 207 P.2d 990.

168

*Robert W. Gilbert,* of Los Angeles, Cal., and *John W. Bonner,* of Las Vegas, for Relators.

*Morse & Graves,* of Las Vegas, and *Brown & Wells,* of Reno, for Respondents.

## OPINION

By the Court, EATHER, J.:

The relators seek a writ of prohibition directing the respondent Eighth judicial district court in and for the

county of Clark, to desist and refrain from taking further proceedings regarding an alleged contempt of a purported temporary restraining order previously issued by that court. On September 9, 1948, a complaint was filed by the White Cross Drug Co. and the Save-Rite Drug Stores of Las Vegas against the Culinary Workers Union Local No. 226 and the Retail Clerks Union Local No. 1536, alleging that the unions through their agents had demanded recognition as bargaining representatives and insisted that a contract containing, among other things, "closed shop" provisions be signed by the drug stores; that the unions did not represent a majority of the employees and that the employees did not wish to join a union; and that the unions then established a picket line around the stores. The complaint prayed for damages and for a restraining order and injunction against further picketing.

The defendant unions demurred to the complaint, chiefly upon the grounds that no cause of action was stated and that the district court had no jurisdiction to issue a restraining order against peaceful picketing. The district court overruled the demurrer, and upon the show-cause hearing issued a restraining order against the unions.[1]

Approximately two weeks later the district court

[1] "It Is Hereby Ordered Adjudged and Decreed that during the pendency of this action, or until the final determination thereof, or until the Court shall otherwise order, the defendants, and each of them, the agents, servants, employees and attorneys of defendants, and each of them, be, and they are hereby enjoined and restrained from picketing and maintaining pickets and signs at the business establishment of the plaintiff White Cross Drug Co., a corporation, situate at 201 Fremont Street, Las Vegas, Clark County, Nevada, and extending south from Fremont Street on Second Street, Las Vegas, Nevada, and into the alley running east and west between Fremont Street and Carson Street, Las Vegas, Nevada; and the business establishment of the plaintiff Save-Rite Drug Stores, Inc., a corporation, situate at 215 Fremont Street, Las Vegas, Clark County, Nevada, and extending into the alley running east and west between Fremont Street and Carson Street, Las Vegas, Nevada; and from in any manner whatever impeding, harassing, annoying, threatening, intimidating or interfering with any person or persons

ordered the culinary workers union and two individuals, Allen Shorr and Vivian Shorr, to show cause why they should not be punished for contempt of the restraining order. This show-cause order was based upon an affidavit made by one T. H. Brandt as vice president of the White Cross Drug Store, alleging that the union acting by and through the Shorrs had picketed in front of the drug store by selling copies of a newspaper, called the Nevada State Labor News. In substance, the affidavit charged that the newspaper carried a front page story to the effect that the drug store had discharged five employees because they were union members and was "unfair to organized labor;" that in hawking their papers the two pickets had shouted headlines to this effect to passers-by on the street.

Relators instituted the present proceedings petitioning this court to prohibit the district court below from enforcing the restraining order, contending that the order is unconstitutional because it denies the right of relators to peacefully picket and to assemble to present their grievances, under the First and Fourteenth Amendments to the Constitution of the United States and under the Constitution of the State of Nevada, and that the district court acted without jurisdiction at the outset by granting the restraining order.

■ The writ of prohibition is unquestionably appropriate as a remedy to hold proceedings in an inferior court which are not within the jurisdiction of such court; Section 9255, N.C.L.1929; McComb v. Fourth Judicial District Court, 36 Nev. 417, 428, 136 P. 563; Walser v. Moran, 42 Nev. 111, 173 P. 1149, 180 P. 492; Public Service Commission v. Eighth Judicial Dist. Court, 61 Nev. 245, 123 P.2d 237. And, when proceedings bear the threat of imprisonment of an individual

transacting business with the plaintiffs, or either of them; and from in any manner whatever impeding harassing, annoying, threatening, intimidating, or interfering with any of the employees of the plaintiffs entering or leaving the premises of the plaintiffs or either of them, * * *."

for contempt of an invalid order of a lower court which order denied him constitutional and fundamental rights, the writ of prohibition is as proper as would be habeas corpus were he already in custody. Habeas corpus and certiorari have frequently been employed to attack an unconstitutional statute or decree limiting peaceful picketing, since "One cannot be punished for contempt for violating an order which a court has no authority to make," Ex parte Henry et al., Tex.Sup., 215 S.W.2d 588, 597, (habeas corpus). In re Blaney, 30 Cal.2d 643, 184 P.2d 892, (habeas corpus). Fortenbury v. Superior Court, 16 Cal.2d 405, 106 P.2d 411, (certiorari). As a matter of simple justice, it has always been considered preferable to arrest proceedings before a man has been unlawfully imprisoned, then to release him after he has been subjected to the indignities of custody, and the writ of prohibition was designed to serve this purpose.

Therefore the remedy selected by relators is proper under these circumstances, if, in fact, the restraining order here in question is not valid.

Relators contend that the right of all persons to assemble and to make known their ideas and grievances is a fundamental element in the structure of our form of government and that peaceful picketing is an exercise of this right. Respondents concede this to be true, but argue that the picketing in the instant case was not truthful and not for a legitimate purpose because the picketed employers had no dispute with their employees or the union, and the union did not represent the employees working in the store. Respondents further contend that the picketing was unlawful because, allegedly, the purpose of the picket line was to force them to sign a so-called "closed shop" agreement, which they claim to be prohibited by section 10473 of the Nevada Compiled Laws 1929. In essence, this argument is based upon the theory that under the circumstances, even peaceful picketing is not a legitimate exercise of the fundamental right of free speech, and may be restrained.

The record shows and it is conceded by all parties that the picket line was peaceful, quiet and orderly at all times, and without violence, so the only major issue before this court is whether there was in this case any other abuse of the rights of speech and assembly as to warrant the finding below that this picket line was wrongful.

■ This court early announced that peaceful picketing was a lawful and reasonable method which could be used by a labor organization to disseminate its ideas and beliefs to the general public, and that such picketing was entitled to the same careful protection as that guaranteed to all forms of free speech by the constitution of the United States and of the State of Nevada. That decision invalidated an anti-picketing ordinance, declaring that its sections constituted "a sweeping prohibition of any form of picketing, irrespective of its nature, purpose or number of pickets, and constitute an interdiction of all activities and free speech sought to be exercised in the form of peaceful picketing," and were "unconstitutional and void, in that they invade the constitutional guaranties of the due process of law clauses of the federal and state constitution, and of section 9 of article 1 of the state constitution guaranteeing free speech and forbidding the state to pass any law to restrain or abridge the liberty of speech." City of Reno, v. Second Judicial District Court, 59 Nev. 416, 95 P.2d 994, 1000, 125 A.L.R. 948.

The supreme court of the United States in Thornhill v. Alabama, 310 U.S. 88, at page 102, 60 S.Ct. 736, at page 744, 84 L.Ed. 1093, involving a similar statute set forth the basic rule that, "In the circumstances of our times the dissemination of information concerning the facts of a labor dispute must be regarded within that area of free discussion that is guaranteed by the Constitution," and that "the safeguarding of these means (picketing) is essential to the securing of an informed and educated public opinion with respect to a matter which is of public concern."

■ The constitutional right to free speech is not limited only to public addresses or pamphlets, or the words of some individual. It embraces every form and manner of dissemination of the ideas held by our people that appear best fitted to bring such ideas and views to the attention of the general populace, and to the attention of those most concerned with them. Peaceful picketing of an enterprise or business is the primary means by which laboring men make known their grievances. It is an appropriate mode of expression of views and opinions that is vital to their legitimate interests. Under the first and fourteenth amendments to the constitution labor speech, like the expressions of businessmen, farmers, educators, political figures, religionists and all other citizens, must be given unfailing and unwavering protection by this court. These great constitutional guaranties of free speech are but a mantle of protection thrown around our basic concept of individual liberty to shelter the people from the chilling blasts of those who oppose their freedom and would take away their rights. It would be unthinkable that we should tear it away. Even greater care must be taken that tiny rents are not allowed to accumulate in the fabric unnoticed and unrepaired lest one day we should find the entire mantle rotted away.

■ The right to peaceful picketing must not be circumscribed by vague and ephemeral notion of "legitimate" and "illegitimate" purposes for which it may or may not be exercised. Free speech, which includes the right to peaceful picketing, must be given the greatest possible scope and have the least possible restrictions imposed upon it, for it is basic to representative democracy. Thomas v. Collins, 323 U.S. 516, 65 S.Ct. 315, 89 L.Ed. 430. It is not enough that the exercise of free speech may injure a business, or that the issues presented are conflicting or exaggerated, for no restraint can be imposed short of "clear and present danger" of serious injury to society as a whole. Thornhill v. Alabama, 310 U.S. 88, 60 S.Ct. 736, 84 L.Ed. 1093; Schenck

v. United States, 249 U.S. 47, 39 S.Ct. 247, 63 S.Ct. 470. In Bridges v. California, 314 U.S. 252, 62 S.Ct. 190, 194, 159 A.L.R. 1346, upholding the right of both a controversial labor leader and an influential daily newspaper to comment upon undecided and pending cases, the United States Supreme Court said: "What finally emerges from the 'clear and present danger' cases is a working principle that the substantive evil must be extremely serious and the degree of imminence extremely high before utterances can be punished. Those cases do not purport to mark the furthermost constitutional boundaries of protected expression, nor do we here. They do more than recognize a minimum compulsion of the Bill of Rights. For the First Amendment does not speak equivocally. It prohibits any law 'abridging the freedom of speech, or of the press.' It must be taken as a command of the broadest scope that explicit language, read in the context of a liberty-loving society, will allow."

And, in Thomas v. Collins, supra [323 U.S. 516, 65 S.Ct. 322], the supreme court explained: " * * * any attempt to restrict those liberties must be justified by clear public interest, threatened not doubtfully or remotely, but by clear and present danger. The rational connection between the remedy provided and the evil to be curbed, which in other contexts might support legislation against attack on due process grounds, will not suffice. These rights rest on firmer foundation. Accordingly, whatever occasion would restrain orderly discussion and persuasion, at appropriate time and place, must have clear support in public danger, actual or impending. Only the gravest abuses, endangering paramount interests, give occasion for permissible limitation. It is therefore in our tradition to allow the widest room for discussion, the narrowest range for its restriction, particularly when this right is exercised in conjunction with peaceable assembly. It was not by accident or coincidence that the rights to freedom in speech and

press were coupled in a single guaranty with the rights of the people peaceably to asemble and to petition for redress of grievances. All these, though not identical, are inseparable. They are cognate rights, cf. De Jonge v. Oregon, 299 U.S. 353, 364, 57 S.Ct. 255, 259, 81 L.Ed. 278, and therefore are united in the First Article's assurance."

■ When the right to picket is abused as where this activity is performed in a violent manner exceeding the bounds of peaceful persuasion, it may be restrained. Milk Wagon Drivers Union v. Meadowmoor Dairies, 312 U.S. 287, 61 S.Ct. 552, 85 L.Ed. 836, 132 A.L.R. 1200; Allen-Bradley Local No. 1111 v. Wisconsin Employment Relations Board, 315 U.S. 740, 62 S.Ct. 820, 86 L.Ed. 1154.

■ The record in the instant case, as we have said, shows clearly that there was no violence. The contention of respondents that the restraining order was proper because the union did not represent the employees of the store and because there was no real dispute between the employer and his employees, cannot be maintained. In Senn v. Tile Layers Protective Union, 301 U.S. 468, 57 S.Ct. 857, 81 L.Ed. 1229, which we followed in the City of Reno case, supra, the supreme court of the United States explicitly approved the action of the courts of Wisconsin in permitting the Tile Layers Union to picket a tile layer who insisted on performing his own work and refused to hire a union employee. This doctrine that "stranger" picketing is a valid form of free speech was reaffirmed by the United States Supreme Court in American Federation of Labor v. Swing, 312 U.S. 321, 61 S.Ct. 568, 570, 85 L.Ed. 855, where the court said: "The scope of the Fourteenth Amendment is not confined by the notion of a particular state regarding the wise limits of an injunction in an industrial dispute, whether those limits be defined by statute or by the judicial organ of the state. A state cannot exclude workingmen from peacefully exercising the

right of free communication by drawing the circle of economic competition between employers and workers so small as to contain only an employer and those directly employed by him."

Respondents cite Carpenters and Joiners Union v. Ritter's Cafe, 315 U.S. 722, 62 S.Ct. 807, 86 L.Ed. 1143, for the proposition that peaceful picketing can be enjoined when it is unlawful. That case is not in point here, however, as it involves picketing which was outside the industrial "nexus" of the dispute, while here the picketing was against the very establishment that the union considered to be unfair. Bakery and Pastry Drivers Local v. Wohl, 315 U.S. 769, 62 S.Ct. 816, 86 L.Ed. 1178. "The interdependence of economic interest of all engaged in the same industry has become a commonplace. American Steel Foundaries v. Tri-City Council, 257 U.S. 184, 209, 42 S.Ct. 72, 78, 66 L.Ed. 189, 27 A.L.R. 360. The right of free communication cannot therefore be mutilated by denying it to workers, in a dispute with an employer, even though they are not in his employ. Communication by such employees of the facts of a dispute, deemed by them to be relevant to their interests, can no more be barred because of concern for the economic interest against which they are seeking to enlist public opinion than could the utterance protected in Thornhill's case." American Federation of Labor v. Swing, supra.

██ We are also urged by respondents to refuse prohibition because the "unfair" sign used on the picket line was supposedly untruthful. Where the issue before this court is solely one of the application of a proposed restraint upon peaceful picketing, the relative merits of the claims of the parties or the probable truthfulness of the slogans and signs used is immaterial short of a showing of substantial danger. The principle that there shall be no previous restraint upon the exercise of the right to speak freely is basic to that right. Near v. Minnesota, 283 U.S. 697, 51 S.Ct. 625, 75 L.Ed. 1357,

and there can be no restraint unless a "clear and present danger" exists. Thomas v. Collins, Thornhill v. Alabama, and Schenck v. United States, supra. "To use loose language or undefined slogans that are part of the conventional give-and-take of our economic and political controversies—like 'unfair' or 'fascist'—is not to falsify facts." Cafeteria Employees Union v. Angelos, 320 U.S. 393, 64 S.Ct. 126, 127, 88 L.Ed. 58. Such normal statements or claims which in general convey the idea that a business is " 'unfair' to organized labor" are no more than statements of opinion and are not subject to judicial restraint. Cafeteria Employees Union v. Angelos, supra.; Montgomery Ward & Co. v. McGraw-Hill Publishing Co., 7 Cir., 146 F.2d 171, 176; Park & Tilford Import Corp. v. International Brotherhood of Teamsters, 27 Cal.2d 599, 613, 165 P.2d 891, 162 A.L.R. 1426. The constitutional right to free speech and to peaceful picketing is not to be taken away from one party to an industrial squable simply because the other party objects to his beliefs or to the way that he expresses them, nor because that other party is sustaining economic loss by what he deems to be an annoying use of a picket line or an inaccurate statement of facts. Just as the judiciary cannot validly restrict expression of grievances by union members to the small area of employers for whom they work, a court may also not require workers to couch their views and opinions in legal, correct and accurate words, for their speech is aimed at persuasion, and persuasion demands at times artful, at times flamboyant, and at times even exaggerated language.

The chief contention of respondents and more particularly the employers who are the real parties in interest here, is that the picketing by the union was for the purpose of compelling the drug store to sign a "closed shop" contract and thereby force all employees of the store to become unwilling members of the union. This, they say, is conduct that is unlawful under the 1911 act, sec.

10473, N.C.L.[2] and since it is therefore not a proper exercise of free speech, may be restrained.

 It is evident from the transcript of the oral opin- ion below that the district court was convinced that no demand had actually been made for a "closed shop" and that such a demand was not an issue in the case. The unions insist that the sole object of the picketing was to "persuade or induce" the nonunion workers to join these labor organizations. But even if respondents were correct in their contention that the sole purpose of the picketing by the union was to compel acceptance of a "closed shop" we are not persuaded that this demand was made unlawful under the 1911 act. Respondents argue strongly that the terms of this law which prohibit any agreement by which an employee or prospective employee promises to become or continue to be a member, or not to become a member of a labor organization, preclude and make unlawful any "closed shop" or other union security agreement in this state. They compare the law with recent statutory enactments of North Carolina, Nebraska, and Arizona, which have been upheld by the supreme court of the United States in the so-called "Right to Work" cases. Lincoln Federal Labor Union et al., v. Northwestern Iron and Metal Company et al., 335 U.S. 525, 69 S.Ct. 251, 93 L.Ed. —, and American Federation of Labor v. American Sash & Door Co. et al., 335 U.S. 538, 69 S.Ct. 258, 93 L.Ed. —, and conclude that because of a purported similarity of language our law must also exclude the "closed shop." This

---

[2] Sec. 10473, N.C.L.1929,

"An Agreement To Join Or Not To Join Labor Organization Unlawful, When § 527. It shall be unlawful for any person, firm or corporation to make or enter into any agreement, either oral or in writing, by the terms of which any employee of such person, firm or corporation, or any person about to enter the employ of such person, firm or corporation, as a condition for continuing or obtaining such employment, shall promise or agree not to become or continue a member of a labor organization, or shall promise or agree to become or continue a member of a labor organization."

does not necessarily follow, since our statute must be construed by this court with proper regard for the legislative intent. This court is not bound to and cannot blindly apply the language of this long-standing state law without regard for the conditions which originally gave rise to its enactment. To do so would read into the law aims and purposes never considered or intended by the legislature that enacted the statute. In the process of statutory interpretation, both the express terms and the legislative history underlying the statute must be considered to arrive at the proper construction of its meaning and purpose.

The development of collective bargaining in industrial relations in this country came with the growth of the labor movement and the independent unions. Certain employers opposed this development with many different tactics. One of the earliest methods of opposition was to require employees to sign an agreement that he would not become a member of a labor union in the course of his employment. These contracts incurred the widespread enmity of organized labor and were called "yellow-dog" contracts. Another device used by the employers to defeat legitimate collective bargaining was the establishment of so-called "company unions" which were dominated and controlled by the employer. Both of these methods achieved the desired result of minimizing collective demands by the workers and preventing them from belonging to independent unions. In the Lincoln Federal Labor Union case, supra, Mr. Justice Black summarized this period of labor-management relations, when he said [335 U.S. 525, 69 S.Ct. 256]: "There was a period in which labor union members who wanted to get and hold jobs were victims of widespread employer discrimination practices. Contracts between employers and their employees were used by employers to accomplish this anti-union employment discrimination. Before hiring workers, employers required them

to sign agreements stating that the workers were not and would not become labor union members. Such anti-union practices were so obnoxious to workers that they gave these required agreements the name of 'yellow dog' contracts. This hostility of workers also prompted passage of state and federal laws to ban employer discrimination against union members and to outlaw yellow dog contracts."

The statutes referred to by Mr. Justice Black were similar in form to the 1911 act here in question. None of these state laws purported to invalidate the closed shop or union security agreement. They were passed at the behest of organized labor for the express purpose of promoting legitimate collective bargaining on equal terms, and of prohibiting the "yellow-dog contracts," entered into by an employer possessed of predominant economic strength and an individual worker who was helpless to resist such an arrangement preventing him from joining a union of his choice. These statutes also provided, as does ours, that an employee could not be compelled to join a labor organization. The circumstances behind the enactment of these laws show conclusively that the purpose of these latter provisions was to protect employees from being forced to join a company dominated and controlled union as a condition of employment. These provisions were never intended to forbid union security arrangements but were designed to promote true collective bargaining with representative bona fide labor organizations and to prevent the false, misleading and ineffective representation that was a distinguished feature of the employer dominated "company union."

The supreme court of the State of California was faced with this same problem of statutory construction in Shafer v. Registered Pharmacists Union, 16 Cal.2d 379, 106 P.2d 403, 407, and in that case reached the conclusion that this type of statute was not intended to outlaw union security agreements reached by collective

bargaining. That court pointed out: " * * * the clause 'to join or to remain a member of a labor organization' may not reasonably be construed as prohibiting a promise to join an independent labor union. Although the term 'labor organization,' taken by itself, is broad enough to refer to either a company or an independent union, the purpose of the legislation must be considered in arriving at a conclusion concerning its meaning. If the words are meant to designate an independent union, then it is against public policy for an employee or prospective employee to join such an organization, which is a result exactly contrary to the declaration of policy in section 923. * * * These and other considerations render untenable the contention that union shop contracts in California are void under section 921. As has already been noted, the usual company union contract is an individual agreement between the employer and an employee, whereas the union shop contract is an agreement running between the employer and the union as an entity."

The Nevada act here in question makes certain agreements unlawful when entered into with an employee or "person about to enter the employ" of another and is therefore aimed expressly at individual agreements. It does not mention or prohibit collective agreements or agreements with labor organizations as such, and we conclude as did the California court in the Shafer case, that this law was not enacted for the purpose of making collective union security agreements unlawful.

Respondents have cited the so-called "Right to Work" cases to support their contention that the 1911 act is a valid enactment prohibiting closed shop agreements. In these cases, however, the supreme court clearly distinguishes the long-standing anti-yellow-dog contract laws and the very recent legislations involved in the cases. After discussing the history of the anti-yellow-dog contract legislation, Mr. Justice Black, in upholding the

recent laws concluded that: "Just as we have held that the due process clause erects no obstacle to block legislative protection of union members, we now hold that legislative protection can be afforded non-union workers."

From our study of the legislative history and the background of the 1911 act it is plain to us that this act was enacted to prohibit the "yellow-dog" type of contract and to protect workers from compulsion to join company dominated unions, but that the law does not by its terms outlaw union security agreements obtained through the process of collective bargaining.

If the opponents of union security agreements wish to have them declared unlawful they should address their demands to the legislature for a clear and unmistakable mandate and not appeal to this court for such declaration under color of a law that was never intended to fulfill that purpose.

 Section 2825.32 assuring the right to representation in collective bargaining negotiations, and section 10061 of the N.C.L. dealing with criminal conspiracy, were cited to this court by respondents as making the acts of relators unlawful, but neither of these laws were strenuously urged in brief or oral argument. Neither of these laws can be relied upon to restrain peaceful picketing of the type here in question, and if they were to be so construed, such application would be an unconstitutional deprivation of the rights of speech and assembly.

 Many pages of briefs of relators and respondents were devoted to a discussion of the jurisdiction of the district court to restrain relators under the provisions of section 14(b) of the Labor Management Relations Act 1947, also known as the Taft-Hartley Act, 29 U.S.C.A. sec. 141 et seq. It is not necessary for us to decide the issue in this proceeding, holding as we do that the 1911 act was enacted solely as an anti-yellow-dog contract law, and does not invalidate union security agreements. In any event, the law is well settled that a

private party cannot procure an injunction either in a federal or state court under the provisions of the Labor Management Relations Act. Amazon Cotton Mill Co. v. Textile Workers Union of America, 4 Cir., 1948, 167 F.2d 183.

Furthermore, with regard to the claim of lack of jurisdiction the record below shows that no bond or undertaking was filed with the court and entered by it as required by section 8696 N.C.L.1929. Because of this omission, the district court was absolutely without legal power to punish relators under the purported restraining order. We have previously held, that, "Where a bond is required by statute before the issuance of an injunction, it must be exacted or the order will be absolutely void." Shelton v. Second Judicial District Court, 1947, 64 Nev. 487, 185 P.2d 320, 323. The law requires that the bond be filed before the order is made, and the fact that the bond was procured about the time the order was issued and was later filed under a nunc pro tunc order does not cure the defect.

The picket line established by the union in this case was both peaceful and lawful. It was a rightful exercise of the cognate rights of free speech and peaceable assembly and it could not constitutionally be restrained or enjoined without abridging the guaranties of the first and fourteenth amendments to the constitution of the United States, and article I, section 9 of the constitution of the State of Nevada. The restraining order issued by the court below cannot be upheld or enforced, and relators here cannot be punished under its purported authority.

The writ of prohibition is herewith granted. Let the writ issue as prayed for.

HORSEY, C. J., concurs.

BADT, J. (dissenting):

I dissent. In my opinion the picketing was properly enjoined because its admitted objective was to compel

a violation of the statutes of this state.[1] The picketing was accomplished by two pickets, sometimes three, patrolling the premises around the stores, with placards reading "Unfair to organized labor—Central Labor Council A. F. of L." The employees of both drug stores were and had been employed without regard to any affiliation with any labor union. There was no dispute between either employer and its employees as to wages, hours, conditions of employment, or otherwise.

Under these conditions both employers were approached by representatives and agents of the unions and the latter were permitted to interview the employees during working hours. The purpose of these interviews was to persuade or induce the employees to join the union. Up to the time of the picketing and the initiation of the contempt proceedings neither the unions nor their representatives had been authorized by the majority of the employees of either drug store to act as the spokesman, representative or bargaining agent of either group of employees. It is not contended that the picketing was not a violation of the injunction, but it is asserted that the district court was without jurisdiction to issue the injunction and is therefore without jurisdiction to punish the relators for contempt for such violation.

[1] Section 10473, Nevada Compiled Laws, appearing therein as sec. 527 of "An Act concerning crimes and punishments, and repealing certain acts relating thereto," approved March 17, 1911, and which appeared as sec. 6792 in the Revised Laws of Nevada of 1912, read as follows: "It shall be unlawful for any person, firm or corporation to make or enter into any agreement, either oral or in writing, by the terms of which any employee of such person, firm or corporation, or any person about to enter the employ of such person, firm or corporation, as a condition for continuing or obtaining such employment, shall promise or agree not to become or continue a member of a labor organization, or shall promise or agree to become or continue a member of a labor organization."

Section 2825.31, N.C.L., approved March 29, 1937, read in part as follows:

"In the interpretation and application of this act, the public policy of this state is declared as follows:

"Negotiations of terms and conditions of labor should result from

The district court did not make findings of fact, but following the submission of evidence by both parties on the order to show cause rendered an oral opinion from the bench which may be said to incorporate certain findings. The district court held that the picketing was unlawful because its objective was to compel a violation of the statutes and declared policy of the State of Nevada, making it unlawful for an employer to require an employee, as a condition of employment, to agree to belong to a union. While the evidence is somewhat conflicting as to the demands made upon the employers by the union representatives, Mr. Thomas C. Hanley, secretary of the Clark County Central Labor Council, affiliated with the American Federation of Labor, when asked upon cross examination what the purpose of the picket line was, replied: "To let the public in general know, the other labor organizations and public, that the people employed were not members of a union, that the wages were not standard, that the employers were not members of a union, of our union, *that a contract had been submitted and refused and the picket line was then put on.* They were unfair to labor." And Mr. Royalty, the business manager of the Culinary Workers Union, in testifying about one of the meetings with the employer, said: " * * * I understood from

---

voluntary agreement between employer and employees. Governmental authority has permitted and encouraged employers to organize in the corporate and other forms of capital control. In dealing with such employers the individual organized worker is helpless to exercise actual liberty of contract and to protect his freedom of labor, and thereby to obtain acceptable terms and conditions of employment. Therefore, it is necessary *that the individual workman have full freedom* of association, self-organization, and designation of representatives of his own choosing, to negotiate the terms and conditions of his employment, and *that he shall be free from the interference, restraint or coercion of* employers of labor, *or their agents.* in the designation of such representatives or in self-organization or in other concerted activities for the purpose of collective bargaining or other mutual aid or protection."

In the case of both of the legislative acts referred to, a violation is declared to be a misdemeanor punishable by fine and imprisonment.

the line of conversation *it pertained mostly to the standard contract of the union."* It was further testified that the purpose of the picket line was to induce the employees to join the union.

All emphasis in this opinion is supplied unless otherwise noted.

Clauses contained in the standard form of union contract, that is to say, the contract between the employers and the union, include the following:

"Sec. 1 Jurisdiction and Recognization: The Employer agrees to recognize the Union as the sole collective bargaining agency for its employees working under the Union's jurisdiction for the purpose of collective bargaining. It is further agreed by both parties thereto that this agreement shall cover all working conditions, wages and hours of employment affecting the employees working in the employer's establishment.

"Sec. 2 Hiring: *All employees, steady or extra, covered by this agreement shall be hired only through the office of the Union, such employees shall be and remain in good standing in the Union as a condition of employment and must obtain a work slip from the Union before going to work.*

"If the Union is unable to supply satisfactory help to the employer, then the employer may hire outside of the Union, providing such hired persons make application to join the Union within seventy-two hours of the date of their employment and complete the same and be initiated within a period of thirty (30) days from the date of employment."

The contentions of the relators and the conclusions reached by my learned brothers are tied definitely to the theory that the picketing in question was an exercise of the right of free speech and could not be lawfully enjoined. Neither the relators nor the majority of this court concede any limitation to such theory, except possibly in the case of a clear and present danger to the

public peace. That peaceful picketing is constitution- ally protected from restraint, that advertising a business as unfair to organized labor is privileged free speech and not subject to injunction, that no federal or state law does or can confer jurisdiction upon the district court to enjoin peaceful picketing are apparently deemed not subject to any exception growing out of the unlawfulness of the objective of the picketing.

This dissenting opinion as originally drafted had recited the history of the rise, development, extension and subsequent curtailment of the theory that picketing, as an adjunct of free speech, could not be restrained.[2] Of whatever incidental value such history might have been, I concluded that its inclusion in this opinion was not justified.

We start with the proposition that if the objective of the picketing was an unlawful one, it could properly be enjoined without infringement of the constitutional guaranties of free speech and free assembly.

[2] In this state the absolute right of an employer for reasons "good or bad, well or ill founded, or entirely trivial and whimsical," to refuse to have business relations with any person or labor organization was first established by Farrington, District Judge of the United States District Court for the District of Nevada, relying upon Allgeyer v. Louisiana, 165 U.S. 578, 17 S.Ct. 427, 41 L.Ed. 832; Lochner v. New York, 198 U.S. 45, 25 S.Ct. 539, 49 L.Ed. 937, 3 Ann.Cas. 1133; Gillespie v. People, 188 Ill. 176, 58 N.E. 1007, 52 L.R.A. 283, 80 Am. St.Rep. 176; Adair v. United States, 208 U.S. 161, 28 S.Ct. 277, 52 L.Ed. 436. The Adair case theory was carried out in Coppage v. Kansas, 1914, 236 U.S. 1, 35 S.Ct. 240, 59 L.Ed. 441, L.R.A.1915C, 960. As to the discharging of an employee because of the latter's union affiliations, the theory was repudiated in Pennsylvania R. Co. v. United States Railroad Labor Board, 261 U.S. 72, 43 S.Ct. 278, 67 L.Ed. 536; Texas & N. O. R. Co. v. Brotherhood of R. & S. S. Clerks, 281 U.S. 548, 50 S.Ct. 427, 74 L.Ed. 1034; Virginian R. Co. v. System Federation No. 40, 300 U.S. 515, 57 S.Ct. 592, 81 L.Ed. 789; National Labor Rel. Board v. Jones & Laughlin Steel Corp., 301 U.S. 1, 57 S.Ct. 615, 81 L.Ed. 893, 108 A.L.R. 1352. The repudiation of the theory was later applied also to hiring. Phelps Dodge Corp. v. National Labor Relations Board, 1941, 313 U.S. 177, 61 S.Ct. 845, 85 L.Ed. 1271, 133 A.L.R. 1217. The impact of the Clayton Act in 1914, c. 323, 38 Stat. 738, 29 U.S.C.A. ch. 5, sec. 52, long

Our sole consideration then is the construction of sec. 10473, quoted in full in footnote No. 1 and also quoted in the prevailing opinion. The majority adopt relators' oft repeated characterization of this statute as one that simply outlaws " 'yellow dog' contracts," and quote Mr. Justice Black, in delivering the opinion of the court in the Lincoln Federal Labor Union case and Whitaker v. North Carolina, 335 U. S. 525, 69 S.Ct. 251, 256, 93 L.Ed. —, as thus defining the situation.

"There was a period in which labor union members who wanted to get and hold jobs were the victims of widespread employer discrimination practices. Contracts between employers and their employees were used by employers to accomplish this anti-union employment discrimination. Before hiring workers, employers required them to sign agreements stating that the workers were not and would not become labor union

prior to the National Labor Relations Act of 1935, and the opinion of Mr. Chief Justice Taft in American Steel Foundaries v. Tri-City Council, 1921, 257 U.S. 184, 42 S.Ct. 72, 66 L.Ed. 189, 27 A.L.R. 360, require consideration. Even in N. L. R. B. v. Jones & Laughlin Steel Corp., supra, and kindred cases in the 1930's, picketing had not yet been identified with the right of free speech. Then came Senn v. Tile Layers Union, 1937, 301 U.S. 468, 57 S.Ct. 857, 81 L.Ed. 1229, relied upon in the majority opinion. This was followed by Thornhill v. Alabama, 310 U.S. 88, 60 S.Ct. 736, 84 L.Ed. 1093, and Carlson v. California, 310 U.S. 106, 60 S.Ct. 746, 84 L.Ed. 1104, both decided February 29, 1940. These cases left open the right of relief against picketing only in cases of "clear and present danger of destruction of life or property, or invasion of the right of privacy or breach of the peace." Just prior to the Thornhill and Carlson cases this court, in 1939, decided City of Reno v. Second Judicial District Court, 59 Nev. 416, 95 P.2d 994, 125 A.L.R. 948, striking down a city ordinance that unqualifiedly prohibited all picketing. Bridges v. California, 314 U.S. 252, 62 S.Ct. 190, 159 A.L.R. 1346; Thomas v. Collins, 323 U.S. 516, 65 S.Ct. 315, 89 L.Ed. 430, and Cafeteria Employees Union v. Angelos, 320 U.S. 293, 64 S.Ct. 126, 88 L.Ed. 58, further exemplified the free speech theory, which probably had reached its height in American Federation of Labor v. Swing, 1940, 312 U.S. 321, 61 S.Ct. 568, 85 L.Ed. 855. As this case involved only peaceful persuasion disentangled from violence, it was distinguished from Milkwagon Drivers Union v. Meadowmoor Dairies, 312 U.S. 287, 61 S.Ct. 552, 555, 85 L.Ed. 836, 132 A.L.R. 1200, decided the same day.

Starting with the Meadowmoor case, where the picketing, though

members. Such anti-union practices were so obnoxious to workers that they gave these required agreements the name of 'yellow dog' contracts. This hostility of workers also prompted passage of state and federal laws to ban employer discrimination against union members and to outlaw yellow dog contracts."

The Nevada statute, on the contrary, is clearly a nondiscrimination statute making it unlawful for an employer to enter into an agreement whereby the employee shall promise *either* to be a union man *or* a nonunion man. The North Carolina statute involved in the Whitaker case reads as follows: "Any agreement or combination between any employer and any labor union or labor organization whereby persons not members of such union or organization shall be denied the right to work for said employer, or whereby such membership is made a condition of employment or continuation of employment by such employer, or whereby any

---

peaceful in isolation, was "part of a coercive thrust when entangled with acts of violence," and the implications of Bakery and Pastry Drivers v. Wohl, 315 U.S. 769, 62 S.Ct. 816, 86 L.Ed. 1178, where the object of the picketing was unlawful, we have Hotel and Restaurant Employees International Alliance v. Wisconsin Employment Relations Board, 1942, 315 U.S. 437, 62 S.Ct. 706, 86 L.Ed. 946, and Allen-Bradley Local v. Wisconsin Employment Relations Board, 1942, 315 U.S. 740, 62 S.Ct. 820, 86 L.Ed. 1154, in both of which the restraint of picketing was upheld because of its unlawful objective. On the same day was decided Carpenters and Joiners Union of America v. Ritter's Cafe, 315 U.S. 722, 62 S.Ct. 807, 809, 86 L.Ed. 1143, restraining picketing "outside the economic context of the real dispute," and recognizing picketing as exertion of concerted pressure, as a familiar weapon of industrial combat and similar characterizations. The court refused "to transmute vital constitutional liberties into doctrinaire dogma." This had been likewise recognized in the Wohl case in the concurring opinion. The culmination of the limitations on the former virtually unlimited free speech theory is found in A. F. of L. v. American Sash & Door Co., Lincoln Federal Labor Union v. Northwestern Iron & Metal Co. and Whitaker v. North Carolina, 69 S.Ct. 251, 264, and Kovacs v. Cooper, 1949, 336 U.S. 771, 69 S.Ct. 448. James v. Marinship Corporation 1944, 25 Cal.2d 721, 155 P.2d 329, 334, and Hughes v. Superior Court, 1948, 32 Cal.2d 850, 198 P.2d 885, definitely established the right to enjoin picketing if its objective is unlawful in the State of California.

such union or organization acquires an employment monopoly in any enterprise, is hereby declared to be against the public policy and an illegal combination or conspiracy in restraint of trade or commerce in the State of North Carolina." Laws N.C.1947, c. 328, sec. 2.

It will be observed that this statute outlawed the denial of work to nonunion men.

The Nebraska constitutional amendment reads as follows: "No person shall be denied employment because of membership in or affiliation with, or resignation or expulsion from a labor organization or because of refusal to join or affiliate with a labor organization; nor shall any individual or corporation or association of any kind enter into any contract, written or oral, to exclude persons from employment because of membership in or non-membership in a labor organization." Const.Neb. .art. 15, sec. 13, as adopted in 1946.

This amendment struck down the right to deny employment either because of membership or nonmembership in a union. The Arizona constitutional amendment reads as follows: "No person shall be denied the opportunity to obtain or retain employment because of non-membership in a labor organization, nor shall the state or any subdivision thereof, or any corporation, individual or association of any kind enter into any agreement, written or oral, which excludes any person from employment or. continuation of employment because of non-membership in a labor orbanization." Laws Ariz.1947, p. 399.

This constitutional amendment, like the North Carolina statute outlawed the denial of employment because of the employee's nonmembership in a union. The effect of the North Carolina and Nebraska enactments is thus simply described in the opening paragraph of Mr. Justice Black's opinion: "Under employment practices in the United States, employers have sometimes limited work opportunities to members of unions, sometimes to non-union members, and at other times have employed

and kept their workers without regard to whether they were or were not members of a union. Employers are commanded to follow this latter employment practice in the states of North Carolina and Nebraska. A North Carolina statute, and a Nebraska constitutional amendment provide that no person in those states shall be denied an opportunity to obtain or retain employment because he is or is not a member of a labor organization. To enforce this policy North Carolina and Nebraska employers are also forbidden to enter into contracts or agreements obligating themselves to exclude persons from employment because they are or are not labor union members."

The issues involved were further described by him as follows: "These state laws were given timely challenge in North Carolina and Nebraska courts on the ground that insofar as they attempt to protect non-union members from discrimination, the laws are in violation of rights guaranteed employers, unions, and their members by the United States Constitution. The state laws were challenged as violations of the right of freedom of speech, of assembly and of petition guaranteed unions and their members by 'the First Amendment' and protected against invasion by the state under the Fourteenth Amendment.' "

Defining the contention of the unions further, Mr. Justice Black stated: "It is also argued that the state laws do not provide protection for union members equal to that provided for non-union members. But in identical language these state laws forbid employers to discriminate against union and non-union members. Nebraska and North Carolina thus command equal employment opportunities for both groups of workers. It is precisely because these state laws command equal opportunities for both groups that appellants argue that the constitutionally protected rights of assembly and due process have been violated. For the constitutional protections surrounding these rights are relied on by

appellants to support a contention that the Federal Constitution guarantees greater employment rights to union members than to non-union members. This claim of appellants is itself a refutation of the contention that the Nebraska and North Carolina laws fail to afford protection to union members equal to the protection afforded non-workers."

If there is any distinction in principle between the foregoing situation and that created by the Nevada statute, it is one that grows out of arrangement of words or phrases and not out of meaning, principle or effect.

In the Arizona case Mr. Justice Black, again speaking for the court, thus refers to the Arizona amendment [335. U.S. 538, 69 S.Ct. 259] :

"The language of the Arizona amendment prohibits employment discrimination against non-union workers but it does not prohibit discrimination against union workers. It is argued that a failure to provide the same protection for union workers as that provided for non-union workers places the union workers at a disadvantage, thus denying unions and their members the equal protection of Arizona's laws.

"Although the Arizona amendment does not itself expressly prohibit discrimination against union workers, that state has not left unions and union members without protection from discrimination on account of union membership. Prior to passage of this constitutional amendment, Arizona made it a misdemeanor for any person to coerce a worker to make a contract 'not to join or become a member of any labor organization' as a condition of getting or holding a job in Arizona. A.C.A. 1939 § 43–1608. A section of the Arizona code made every such contract (generally known as a 'yellow dog contract') void and unenforceable. Similarly, the Arizona constitutional amendment makes void and unenforceable contracts under which an employer agrees to discriminate against non-union workers."

He refers further to the situation in Arizona as follows: "Statutes implementing the amendment have

provided as sanctions for its enforcement relief by injunction and suits for damages for discrimination practiced in violation of the amendment."

If further explanation is needed to analyze the issues in these cases the concurring opinion of Mr. Justice Frankfurter, in all three cases, may be noted. The learned justice says:

"Arizona, Nebraska, and North Carolina have passed laws forbidding agreements to employ only union members. The United States Constitution is invoked against these laws." Note further Mr. Justice Black's analysis in the Lincoln and Whitaker cases: "Under the state policy adopted by these laws, employers must, other considerations being equal, give equal opportunities for remunerative work to union and non-union members without discrimination against either. In order to achieve this objective of equal opportunity for the two groups, employers are forbidden to make contracts which would obligate them to hire or keep none but union members. Nothing in the language of the laws indicates a purpose to prohibit speech, assembly, or petition. Precisely what these state laws do is to forbid employers acting alone or in concert with labor organizations deliberately to restrict employment to none but union members."

When we consider the testimony of relators' witness Hanley that the purpose of the picketing was to acquaint the public with certain facts including the fact that a union contract had been submitted to the employers and rejected (which contract, if executed, would have required the employers to employ none but union men, in violation of the Nevada statute), in connection with the contention of relators that the injunctive restraint against this accomplishment destroyed their constitutional right of free speech, the following from the opinion of the court is particularly illuminating:

"It is difficult to see how enforcement of this state policy could infringe the freedom of speech of anyone, or deny to anyone the right to assemble or to petition

for a redress of grievances. And appellants do not contend that the laws expressly forbid the full exercise of those rights by unions or union members. Their contention is that these state laws indirectly infringe their constitutional rights of speech, assembly, and petition. While the basis of this contention is not entirely clear, it seems to rest on this line of reasoning: The right of unions and union members to demand that no non-union members work along with union members is 'indispensable to the right of self organization and the association of workers into unions'; without a right of union members to refuse to work with non-union members, there are 'no means of eliminating the competition of the non-union worker'; since, the reasoning continues, a 'closed shop is indispensable to achievement of sufficient union membership to put unions and employers on a full equality for collective bargaining, a closed shop is consequently an indispensable concomitant' of 'the right of employees to assemble into and associate together through labor organizations. * * *' Justification for such an expansive construction of the right to speak, assemble and petition is then rested in part on appellant's assertion 'that the right of a non-unionist to work is in no way equivalent to or the parallel of the right to work as a union member; that there exists no constitutional right to work as a non-unionist on the one hand while the right to maintain employment free from discrimination because of union membership is constitutionally protected.' Cf. Wallace Corporation v. National Labor Relations Board, 323 U.S. 248, 65 S.Ct. 238, 89 L.Ed. 216.

"We deem it unnecessary to elaborate the numerous reasons for our rejection of this contention of appellants. Nor need we appraise or analyze with particularity the rather startling ideas suggested to support some of the premises on which appellants' conclusions rest. There cannot be wrung from a constitutional right of workers to assemble to discuss improvement of their

own working standards, a further constitutional right to drive from remunerative employment all other persons who will not or can not, participate in union assemblies. The constitutional right of workers to assemble, to discuss and formulate plans for furthering their own self interest in jobs cannot be construed as a constitutional guarantee that none shall get and hold jobs except those who will join in the assembly or will agree to abide by the assembly's plans. For where conduct affects the interests of other individuals and the general public, the legality of that conduct must be measured by whether the conduct conforms to valid law, even though the conduct is engaged in pursuant to plans of an assembly."

Further the court states (and this is a positive repudiation of Shafer v. Registered Pharmacists Union, 16 Cal. 2d 379, 106 P.2d 403, on which the majority place strong reliance) ;

"If the states have constitutional power to ban such discrimination by law, they also have power to ban contracts which if performed would bring about the prohibited discrimination. Chicago, B. & Q. R. Co. v. McGuire, 219 U.S. 549, 570, 571, 31 S.Ct. 259, 263, 55 L.Ed. 328.

"Many cases are cited by appellants in which this Court has said that in some instances the due process clause protects the liberty of persons to make contracts. But none of these cases, even those according the broadest constitutional protection to the making of contracts, ever went so far as to indicate that the due process clause bars a state from prohibiting contracts to engage in conduct banned by a valid state law. So here, if the provisions in the state laws against employer discrimination are valid, it follows that the contract prohibition also is valid. Bayside Fish Flour Co. v. Gentry, 297 U.S. 422, 427, 56 S.Ct. 513, 515, 80 L.Ed. 772. And see Sage v. Hampe, 235 U.S. 99, 104–105, 34 S.Ct. 94, 95, 59 L.Ed. 147."

Referring to the fact that several other states "now have such laws" including footnote reference to sec. 10473, N.C.L., Mr. Justice Frankfurter in concurring says: "If the proponents of union-security agreements have confidence in the arguments addressed to the Court in their 'economic brief,' they should address those arguments to the electorate."

Such is the situation with which sec. 10473, Nevada Compiled Laws, is confronted. The statute prohibits employment contracts discriminating against either union or nonunion workers. As preventing discrimination against union workers, relators concede, nay assert, that it is valid. They even declare in their supplemental brief that they do not attack the constitutionality of sec. 10473 and say that respondents mistakenly conceive relators' attack upon the injunction as a challenge to the validity of the statute. The original petition of the relators did definitely challenge the validity of the statue. Be that as it may, if the statute is valid (and under the latest decisions of the United States Supreme Court we cannot hold otherwise) then the execution of a contract by the drug stores to employ only union men would be unlawful. Picketing to compel the performance of an unlawful act was likewise unlawful and subject to restraint by injunction.

In the North Carolina and Nebraska cases the state statutory enactments were approved by a unanimous court. In the Arizona case the state constitutional amendment was approved, with a dissent noted by Mr. Justice Murphy but without any dissenting opinion. Mr. Justice Frankfurter's concurring opinion applied to all three cases. Despite the bitter controversies that have raged in the United States Supreme Court starting with the Adair and Coppage cases and running through the entire gamut of the Senn, Thornhill, Carlson, Meadowmoor, Wohl, Ritter, and other cases, we find here almost unanimous approval (only one dissent, without opinion,

being noted) of state enactments outlawing discrimination in employment of union or nonunion workers. The broad characterizations by Mr. Justice Black and Mr. Justice Frankfurter of the nature of the North Carolina, Nebraska and Arizona enactments just as aptly fit the Nevada statute. Indeed, as noted, sec. 10473, N.C.L. is noted in the footnote as an anti-discrimination statute similar to those enacted by many other states. The prevailing opinion of the court in this case emphasizes the difference between the Nevada statute and the three statutes construed in the opinions above discussed. It insists that the only contracts outlawed in Nevada are contracts between the employer and the employee and not contracts between the employer and the union, and that this distinction was especially recognized by the Supreme Court of California in Shafer v. Registered Pharmacists Union, 16 Cal.2d 379, 106 P.2d 403. It is quite true that the prevailing opinion in that case, written by Mr. Justice Edmonds construing the California statute, in many respects quite similar to the Nevada statute, rejects the theory that the declaration that it is contrary to public policy for the employer and employee to contract that the latter shall join or shall not join a "labor organization" applies to a contract between an employer and an independent union that would require such union membership. In this respect the opinion says, 106 P.2d 408: "The argument is also made that it is absurd to suppose that these provisions were written with the intention of restraining the employer from influencing his employee, while at the same time conferring upon other individuals the right to 'coerce' the same employee through the employer. But the right of workman to organize for the purpose of bargaining collectively would be effectually thwarted if each individual had the absolute right to remain 'unorganized' * * *." But this is precisely the contention that was rejected by the United States Supreme Court in the

most forcible language. Mr. Justice Edmonds in actual words rejects the proposition that "each individual [has] the absolute right to remain 'unorganized'." In Lincoln Federal Union v. Northwestern Iron and Metal Company, supra, and Whitaker v. North Carolina, supra, the contention was made "that the right of a non-unionist to work is in no way equivalent to or the parallel of the right to work as a union member; that there exists no constitutional right to work as a non-unionist on the one hand while the right to maintain employment free from discrimination because of union membership is constitutionally protected." The ideas supporting this proposition were characterized by the United States Supreme Court as "startling." In short, the theory of the prevailing opinion in the Shafer case, decided in 1940, is condemned, discountenanced, rejected and repudiated by a virtually unanimous United States Supreme Court in 1949. Against California's rejection of the right of each individual employee to remain "unorganized" the United States Supreme Court says: "Just as we have held that the due process clause erects no obstacle to block legislative protection of union members, we now hold that legislative protection can be afforded non-union workers."

Shafer v. Registered Pharmacists Union 16, Cal.2d 79, 106 P.2d 403, and Mackay v. Retail Automobile Salesmen's Union, 16 Cal.2d 311, 106 P.2d 373, were decided on the same day, October 14, 1940. In both cases Mr. Justice Edmonds wrote the opinion for the court. In both cases Justices Curtis, Shenk and Marks dissented. The opinions are too long to quote at length. Suffice it to say that in both cases the opinion of Mr. Justice Edmonds and the concurring opinion of Mr. Justice Moore consistently establish a doctrine repudiated by the United States Supreme Court in the cases last above discussed, while on the other hand the dissenting opinion of Mr. Justice Curtis and at least the first phase of the dissent of Mr. Justice Marks are

in accord therewith. The second phase of the dissenting opinion of Mr. Justice Marks, in which he attacks peaceful picketing as a means of economic coercion and not as an exercise of the right of free speech, need not be considered here. Despite my notation in footnote 2 of the gradual departure of the United States Supreme Court from the complete identification of picketing with free speech, it is unnecessary for me to do otherwise than to indulge the correctness of the premise of such identification.

The sole reason for the issuance of the injunction by the district court against the picketing engaged in by the relators was that its objective was unlawful, namely, to compel the respondent employer drug stores to violate sec. 10473, N.C.L. by insisting that their employees join the union. In this, with due respect to the opinions of my two learned associates, I am convinced that the respondent court was correct so long as sec. 10473 N.C.L. remains on the statute books. It is not our province to pass upon the propriety or advisability of that statute. It is said on the one hand that the statute was passed at the instance of union labor, and it is said on the other hand that union labor has, without success, attempted to accomplish its repeal by past legislatures. It is a matter of common knowledge that union labor unsuccesfully submitted to the 1949 legislature an act to repeal sec. 10473. It would be presumptuous on the part of this court to suggest the propriety or advisability of such legislation. All such considerations lie with the legislature, and the legislature alone, unless the initiative or referendum be invoked by the people themselves.

The majority's conclusion that the term "labor organization," as twice used in sec. 10473, has reference to a "company union" and not to an "independent union" is in my opinion without justification. Further, to shut our eyes as sensible men to the objective of the picketing (and to its effect if the purpose were accomplished), namely, that the employers could hire no employees

except those who "shall be and remain in good standing in the union as a condition of employment" and who "must obtain a work slip from the union before going to work," is simply to shut our eyes to the facts of the case and decide the same upon mere dogma.

No more convincing is the holding of the majority opinion that sec. 10473, N.C.L. was adopted at the instance of union labor and therefore cannot possibly be interpreted as denouncing a union security agreement or closed shop agreement when entered into between the employer and the union, although the statute did on its face outlaw such a discriminatory agreement when entered into between an employer and employee. This argument implies that the legislature of this state purposely and deliberately put "a joker" into sec. 10473; that it adopted that section with its tongue in its cheek, saying "we are outlawing discrimination against either union or nonunion men, *when effected by contract between employer and employee,* but such discrimination against either union or nonunion men is perfectly lawful and valid if effected by a contract between the employer and some other person, firm, association or corporation." It is entirely lacking in logic. The broad characterization given to the North Carolina, Nebraska and Arizona enactments by the United States Supreme Court can leave no doubt but that if the Nevada statute had been under its consideration at the same time it would have received precisely the same treatment. The fine distinction attempted to be drawn by the majority opinion between the Nevada statute and the other enactments thus characterized and described and interpreted and construed by the United States Supreme Court is, with due respect to the opinion of my learned brethren, not warranted. An interpretation of sec. 10473 that permits and encourages by indirection the violation of our anti-discrimination statute is, in my opinion, an example of that kind of legalistic reasoning that invites criticism of the court. If there is anything to the contrary in Lauf v. E. G. Shinner & Co., 303 U.S. 323, 58 S.Ct. 578,

82 L.Ed. 872, its force has been dispelled by the Lincoln, Whitaker and American Sash & Door Company cases. The same may be said of other cases relied upon by relators and cited by the majority opinion on this point. No more convincing is the argument that our statute cannot be applied to agreements between employers and unions because of the history of the legislation and the claim that the act was passed at the instance of union labor. This argument is made along the lines of Mr. Justice Edmond's opinion in the Shafer and McKay cases, supra. The majority of this court indicate their opinion that sec. 10473 was first proposed by labor in a form that simply outlawed discrimination against union men and that the proposed act was amended and finally adopted as adding the proscription against discrimination against nonunion men. This may indeed be so— and probably is. It only serves to indicate that the history of the legislation so strongly relied upon by Mr. Justice Edmonds has no application here, as it develops from the very contention of the majority that our statute as finally adopted was upon the insistence, not only of labor but likewise upon the insistence of those desiring to avoid discrimination against either group of employees. And if reliance is still made upon the history of the legislation there need only be pointed out the consistent efforts of labor to repeal the statute in its entirety.

One brief paragraph of the prevailing opinion also holds that the court was without jurisdiction because no bond for the temporary injunction was filed. Without further discussion of this issue or of the fact that it was filed nunc pro tunc as of the date of the order and prior to the violation of the order, I may simply note that both parties have indicated in their briefs and oral arguments the necessity for the disposition of this case on the main grounds discussed in both opinions. The question of the bond was in my opinion not strongly urged by relators.

In conclusion I may summarize my views as follows:

(1) The legislature of this state violated no constitutional limitation in passing sec. 10473, N.C.L.; (2) that section outlawed labor employment contracts discriminating against either union or nonunion men; ·(3) although the statute does not in terms bar contracts between employers and unions, such contracts, indirectly but inevitably accomplishing the same thing that the statute proscribes, are likewise outlawed; (4) the objective of the picketing being to compel the employers to enter into a contract with the union whereunder the employer could employ none but union men, such objective was unlawful; (5) as the objective of the picketing was unlawful, it was subject to restraint by injunction; (6) the district court having assumed jurisdiction and being supported in its conclusions that the picketing was for an unlawful purpose, the issuance of the restraining order should be sustained.

It should be emphasized that the situation is purely a legislative one. If the legislature sees fit to repeal the statute, a future action premised upon the same grounds as the present one will not thereafter lie. If the legislature sees fit to maintain this statute on the books, we should not do otherwise than respect its complete power so to do, without nullifying its action under the guise of judicial interpretation. As the situation stands now, the objective of the picketing was one declared unlawful by our statute and could properly be enjoined. I am of the opinion that the injunction was properly issued and that the writ should be denied and the alternative writ dismissed.

### ON PETITION FOR REHEARING

October 11, 1949. 210 P.2d 454.

*Robert W. Gilbert,* Los Angeles, Cal., and *John W. Bonner,* Las Vegas, attorneys for Relators.

*Morse & Graves,* Las Vegas, and *Brown & Wells,* Reno, attorneys for Respondents.

## OPINION

By the Court, HORSEY, C. J.:

This Court has had occasion heretofore, in City of Reno v. Second Judicial District Court, 59 Nev. 416, 95 P.2d 994, 125 A.L.R. 948, to express the views of the majority of the justices upon the question of the lawfulness of peaceful picketing. Until our recent opinion written by EATHER, J. and concurred in by HORSEY, C. J., and the dissenting opinion by Mr. Justice BADT, in State ex rel. Culinary Workers Union, Local No. 226, et al. v. Eighth Judicial District Court in and for Clark County et al., 66 Nev. 166, 207 P.2d 990, and in which a rehearing has been petitioned and is now pending, the last expression of this court was in the year 1939, in the able and extensive opinion by Mr. Justice DUCKER, concurred in by Mr. Chief Justice TABER, in City of Reno v. Second Judicial District Court, supra.

In the latter opinion, Mr. Justice DUCKER repeatedly referred to Senn v. Tile Layers Protective Union, 301 U.S. 468, 57 S.Ct. 857, 862, 81 L.Ed. 1229, and, in that connection, in 59 Nev. 416, 95 P.2d 994, the learned

justice, on pages 441–442 of 59 Nev., and on page 1004 of 95 P.2d, stated:

"In Senn v. Tile Layers Protective Union, supra, the constitutionality of state anti-injunction legislation designed to prohibit judicial interference with peaceful picketing, was declared, and the intimation that such picketing is protected by the constitutional guaranty of free speech, is too plain to be misunderstood.

"In Ex parte Lyons, 27 Cal.App.2d 293, 81 P.2d 190, 193, it was declared: 'In this state the right to peacefully picket rests upon the constitutional guaranty of the right of free speech.' "

Mr. Justice DUCKER then stated:

"The ordinance on its face, in sections 2 and 4 is obviously adapted to protect the employer from annoyance and incidental loss of business rather than to protect the public in maintaining its peace and the unobstructed use of the streets. But such annoyance and loss in a labor dispute are not tortious nor do they constitute an invasion of any constitutional rights. Senn v. Tile Layers Protective Union, supra. These sections bear no reasonable and substantial relation to the promotion of the public safety, health, morals, general welfare, for which the exercise of the police power may be invoked.

"I am of the opinion that sections 2 and 4 of the Reno City Ordinance No. 480 are unconstitutional and void, in that they invade the constitutional guaranties of the due process of law clauses of the federal and state constitution, and of section 9 of Article 1 of the state Constitution guaranteeing free speech and forbidding the state to pass any law to restrain or abridge the liberty of speech. * * * "

We have, in our recent majority opinion in State ex rel. Culinary Workers Union, Local No. 226 et al. v. Eighth Judicial District Court, in and for Clark County et al., supra, cited, and quoted from, American Federation of Labor v. Swing, 312 U.S. 321, 61 S.Ct. 568, 570, 85 L.Ed. 855, American Steel Foundries v. Tri-City

Central Trades Council, 257 U.S. 184, 209, 42 S.Ct. 72, 78, 66 L.Ed. 189, 27 A.L.R. 360, and many other cases of importance involving the right and lawfulness of peaceful picketing. The members of this court have had occasion, since our recent opinion in State ex rel. Culinary Workers Union v. Eighth Judicial District Court et al., supra, again carefully to consider them in connection with respondents' petition for rehearing, together with the additional authorities in support thereof, and those of the relators in support of their assertion that same should be denied, and it is the view of the majority that the constitutional principles involved are so fundamental and conform so closely to the views of the majority of this court, and which, as we believe, represent the great weight of American authority, that we discern no useful purpose to be served in granting or ordering a rehearing. In the absence of any applicable constitutional provision or statute in Nevada enacted since the opinion in City of Reno v. Second Judicial District Court, supra, or any decisions of other states concerning which we entertain reasonable doubt as to the correctness of our views, we would not be justified in overruling City of Reno v. Second Judicial District Court, supra. Relative to the latter, the majority of this court entertain no such reasonable doubt, but, on the contrary, adhere fully to the view of the majority of this court in City of Reno v. Second Judicial District Court, supra, so clearly and ably expressed therein by the late Mr. Justice DUCKER, and concurred in by the late Mr. Chief Justice TABER.

It may be contended that the act of 1911, sec. 10473, N.C.L., vol. 5, was not directly invoked or necessarily involved in City of Reno v. Second Judicial District Court, supra, even though such statute was enacted long prior thereto. That may be true, but we dare say it would have been directly involved were it not for the fact that said statute, sec. 10473, was generally considered to be based upon what has been usually designated as a "yellow dog" or "company union" contract, and

not within the meaning or purview of a "Right to Work" statute. The majority of this court, in State ex rel. Culinary Workers Union v. Eighth Judicial District Court, supra, 66 Nev. 166, 207 P.2d 990, at pages 997–998, has stated:

"The Supreme Court of the State of California was faced with this same problem of statutory construction in Shafer v. Registered Pharmacists Union, 16 Cal.2d 379, 106 P.2d 403, 407, and in that case reached the conclusion that this type of statute was not intended to outlaw union security agreements reached by collective bargaining. That court pointed out: ' * * * the clause "to join or to remain a member of a labor organization," may not reasonably be construed as prohibiting a promise to join an independent labor union. Although the term "labor organization," taken by itself, is broad enough to refer to either a company or an independent union, the purpose of the legislation must be considered in arriving at a conclusion concerning its meaning. If the words are meant to designate an independent union, then it is against public policy for an employee or prospective employee to join such an organization, which is a result exactly contrary to the declaration of policy in section 923. * * * These and other considerations render untenable the contention that union shop contracts in California are void under section 921. As has already been noted, the usual company union contract is an individual agreement between the employer and an employee, whereas the union shop contract is an agreement running between the employer and the union as an entity.'

"The Nevada act here in question makes certain agreements unlawful when entered into with an employee or 'person about to enter the employ' of another and is therefore aimed expressly at individual agreements. It does not mention or prohibit collective agreements or agreements with labor organizations as such, and we conclude as did the California court in the Shafer case,

that this law was not enacted for the purpose of making collective union security agreements unlawful.

"Respondents have cited the so-called 'Right to Work' cases to support their contention that the 1911 act is a valid enactment prohibiting closed shop agreements. In these cases, however, the supreme court clearly distinguishes the long-standing anti-yellow-dog contract laws and the very recent legislations involved in the cases. After discussing the history of the anti-yellow-dog contract legislation, Mr. Justice Black, in upholding the recent laws concluded that: 'Just as we have held that the due process clause erects no obstacle to block legislative protection of union members, we now hold that legislative protection can be afforded non-union workers.'

"From our study of the legislative history and the background of the 1911 act it is plain to us that this act was enacted to prohibit the 'yellow-dog' type of contract and to protect workers from compulsion to join company dominated unions, but that the law does not by its terms outlaw union security agreements obtained through the process of collective bargaining.

"If the opponents of union security agreements wish to have them declared unlawful they should address their demands to the legislature for a clear and unmistakable mandate and not appeal to this court for such declaration under color of a law that was never intended to fulfill that purpose."

The provisions of section 10473, N.C.L.1929, vol. 5, are as follows: "It shall be unlawful for any person, firm or corporation to make or enter into any agreement * * * by the terms of which any employee of such person * * * shall promise or agree not to become or continue a member of a labor organization, or shall promise or agree to become or continue a member of a labor organization."

Bearing in mind the historical background of the statute, the first clause of the provision, to the effect that "it shall be unlawful" to "promise or agree not to become

or continue a member of a labor organization * * *," is considered entirely clear. Certain employers in many states, by coercion, intimidation and oppressive methods, had prevented contracts between the employers and their employees, by which the employees were free to join labor organizations in order the better to promote and protect such employees in their rights to enter into collective bargaining and to enjoy the legitimate benefits which naturally result from organization, and in order the more equitably to equalize, in their labor relations, the power of capital and of labor. Such oppressive methods were not entirely absent in Nevada, and doubtless occasioned the creation of such statute. But the second or alternative clause of the said provision, namely, "it shall be unlawful * * * shall promise or agree to become or continue a member of a labor organization," is not so clear, at least to the average person. At first blush, it would seem that the benefit and advancement to be realized by the first clause of the provision, abolishing the nefarious "yellow-dog" contract and making it unlawful for an employee to promise or agree not to become a member of a labor organization of its own choosing, might, by the terms of the second clause thereof, namely, "it shall be unlawful" to "promise or agree to become or continue a member of a labor organization," be thwarted, thus defeating the very provisions of the statute, sec. 10473, which ostensibly were to assure the furtherance of more humane and equitable labor relations. Indeed, to some persons, perhaps, without full knowledge of the legislative intention as to such second clause, the provision may have appeared mystifying. It appears, however, a few years later, in the State of California, that the courts of that state, in dealing with a provision in California almost identical in language to that in the said second clause of our provision in section 10473, held that the California legislature had not intended at all, or in any respect, to provide that an employee should not agree to become or

continue a member of a labor organization as to the right of collective bargaining, or to enter into union security agreements or other legitimate functions of labor union activities, but only to prevent so-called "company.union" agreements. Such so-called "company union" agreements were arrangements or devices by which certain employers, instead of further resorting to the former 'yellow dog' agreements by which their employees were required not to become a member of a labor organization, which had been banned, were then resorting to inducing their employees to enter into such "company unions." So, by the California decisions, such as Shafer v. Registered Pharmacists Union, 16 Cal.2d 379, 106 P.2d 403, 407, and others, such "company union" agreements were determined to be against sound public policy, and, by the force and effect of the statute in that state, it became unlawful to become a member of such a "company union," so called.

In dealing with our own statute it has become increasingly clear that, as to the provisions relating to such second clause of section 10473, N.C.L.1929, vol. 5, any uncertainty of interpretation thereof which may have heretofore been existent has been removed by the reasoning of the California decisions above mentioned, and it clearly appears that the statute, and particularly said second clause therein, did not intend to prevent an employee from entering into an agreement to become a member of an independent, legitimate labor organization, with the right freely to bargain and to indulge in labor union activities as guaranteed by the right of freedom of speech and of assembly, but only to curtail and prevent such "company union" contracts as were, in their nature and effect, calculated unduly to influence, coerce and oppress employees. Such "company unions," so-called, were found, by impartial judges, to be no real improvement over the former "yellow-dog" contracts, by which there was no membership in any labor organization, but merely an individual relationship by which the

individual employee was placed at the mercy, so to speak, of the employer. So, for the reason that Mr. Justice DUCKER stated, in effect, that the peaceful picketing by a labor union, in City of Reno v. Second Judicial District Court, supra, was for a lawful objective, sections 2 and 4 of the Reno City Ordinance No. 480 being unconstitutional, the majority of this court in State ex rel. Culinary Workers Union, etc. v. Eighth Judicial Dist. Ct. in and for Clark County, supra, 207 P.2d 990, has found and decided that in section 10473, in the provision in the second clause of said section the purpose or intent was to prohibit so-called "company union" contracts as being against sound public policy. If, by the first clause of said provisions in section 10473, "yellow-dog" contracts were rendered unlawful, likewise the contracts mentioned in the second clause thereof were, by analogy, deemed against public policy, but only as they related to so-called "company union" contracts, and said clause did not, in any respect, make collective security agreements unlawful. The peaceful picketing, therefore, by certain labor unions, to accomplish labor unionization as to the drug stores referred to, in the City of Las Vegas, was for a lawful objective.

In the view of the majority of this court, the said two cases above mentioned, City of Reno v. Second Judicial District Court, and State ex rel. Culinary Workers Union v. Eighth Judicial District Court, supra, are entirely consistent, and each has treated and cited, exhaustively, and we believe, correctly, many phases of freedom of speech and of assembly. In both these cases the principles involved, respectively, are fundamental. The opinion by Mr. Justice DUCKER was based upon the Reno City ordinance No. 480, while State ex rel. Culinary Workers Union v. Eighth Judicial District Court, supra, was based upon the Nevada statute, section 10473, N.C.L., vol. 5, but in each of the cases this court clearly upheld the lawfulness of peaceful picketing as a proper and legitimate labor objective. In each of the said cases,

therefore, the injunctive process was denied, any loss of business, or annoyance, caused by the peaceful picketing by certain labor unions involved being merely incidental and unavoidable, and damnum absque injuria.

We do not feel we should fail to mention a very recent decision of the supreme court of Oregon, filed July 6, 1949. The case appears in the advance sheets of Pacific Reporter, 2d series, August 26, 1949, and is cited as Baker Community Hotel Co. v. Hotel & Restaurant Employees & Bartenders International League, Local 161 et al., Or., 207 P.2d 1129. The opinion was written by Rossman, Justice, and concurred in unanimously. In able, clear and plain language, the learned justice has stated, as reported on pages 1134–1135 and on page 1136, of 207 P.2d, the following:

"We come now to the question as to whether or not the dispute between the respondent and the appellants was a labor dispute within the contemplation of § 102–925, O.C.L.A., for, if it was not, our Anti-Injunction Act is not applicable to this suit. Peters v. Central Labor Council, 179 Or. 1, 169 P.2d 870, 872, which was concerned with the section of our Anti-Injunction Act just mentioned, says:

" 'The vital question is whether the facts disclose a "labor dispute" within the meaning of the Anti-Injunction Act of this state, §§ 102–913 to 102–925, O.C. L.A. If such dispute exists, no injunctive relief can be granted under the Act against peaceful picketing. * * *

" 'It does not follow, however, that the union could not picket for the unionization of the plant even though none of its members were employees therein, as that is, according to the overwhelming weight of authority, a legal labor objective. Lauf v. E. G. Shinner & Co., supra (303 U.S. 323, 58 S.Ct. 578, 82 L.Ed. 872) ; New Negro Alliance v. Sanitary Grocery Co., supra (303 U.S. 552, 304 U.S. 542, 58 S.Ct. 703, 82 L.Ed. 1012) ; Fur Workers Union v. Fur Workers Union, 308 U.S. 522, 60 S.Ct. 292, 84 L.Ed. 443 ; United States v. Hutcheson,

312, U.S. 219, 61 S.Ct. 463, 85 L.Ed. 788; American Federation of Labor v. Swing, supra (312 U.S. 321, 61 S.Ct. 568, 85 L.Ed. 855) ; Levering & Garrigues Co. v. Morrin, 2 Cir., 71 F.2d 284; Blankenship v. Kurfman, 7 Cir., 96 F.2d 450; Donnelly Garment Co. v. International L.G.W.U., 8 Cir., 99 F.2d 309; Taxicab Drivers Local Union v. Yellow Cab Operating Co., 10 Cir., 123 F.2d 262; American Furniture Co. v. I. B. of T. C. and H. of A., 222 Wis. 338, 268 N.W. 250, 106 A.L.R. 335; Teller on Labor Disputes, Vol. 1, § 211; 31 Am.Jur. 940, § 215.'

\* \* \* \* \* \* \*

"We are satisfied that the passages just quoted from the Peters decision and the text-book correctly portray the applicable principles of labor law. A demand by a union upon an employer that he unionize his shop, followed by his refusal to do so, constitutes a labor dispute within the conception of § 102–925, O.C.L.A. This court, like all other state courts, has yielded to the superior authority of the Federal Supreme Court, and in so doing has held that peaceful picketing by a union for the purpose of achieving the unionization of a place of employment is lawful and cannot be enjoined by a court of equity. The complaint indicates that at least one of the objectives which the appellants' picketing sought to achieve was the unionization of the hotel and the restaurant which the respondent conducted. From all that we have so far considered, it appears that the picketing was lawful and that it was pursued in furtherance of a labor dispute within the embrace of § 102–925, O.C. L.A."

In view of said section 10473, N.C.L.1929, vol. 5, and the doctrine and authorities elucidating the said "yellow-dog" or "company union" contracts and statutes, notably in the State of California and the authorities there cited, and in the absence of a statute or statutes of a different nature in Nevada, and in view of the wealth of able authorities in the United States Supreme Court and

other federal courts, and in numerous state courts, upholding the lawfulness of peaceful picketing for the accomplishment of a legitimate labor objective, and bearing in mind City of Reno v. Second Judicial District Court, supra, we can do no other than to deny the respondents' petition for a rehearing in the proceedings.

Rehearing denied.

EATHER J., concurs.

BADT, J., I dissent.

The foregoing opinion denying the petition for rehearing implies that a dissenting view would require the overruling of City of Reno v. Second Judicial District Court, 59 Nev. 416, 95 P.2d 994. Such is emphatically not the case. City of Reno, v. Second Judicial District Court simply struck down those sections of a city ordinance that made unlawful *all* picketing, violent or peaceful, en masse or by a single picket, and whether its objective was to accomplish an unlawful purpose or to accomplish a perfectly lawful purpose—"a sweeping prohibition of any form of picketing, irrespective of its nature, purpose[1] or number of pickets, and constitute an interdiction of all activities and free speech sought to be exercised in the form of peaceful picketing." Id., 59 Nev. 416, 433, 95 P.2d 994, 1000. It did not touch either of the two questions before us—first, whether picketing may be enjoined if its objective is unlawful, and secondly, whether the purpose of the picketing of the Las Vegas drug stores (to compel the execution of a contract under which the employers could employ only union men) was in violation of our statute. An affirmative answer to the first query must be conceded. It was recently re-affirmed by the supreme court of the United States in Giboney v. Empire Storage & Ice Co., 1949,

[1] Here we have the unmistakable implication that the court would not have invalidated the statute if it had declared unlawful only such picketing that was violent or had for its objective the accomplishment of an unlawful purpose.

336 U.S. 490, 69 S.Ct. 684. The majority is at great pains to point out that sec. 10473, Nevada Compiled Laws, making it unlawful for an employer to cause his employee to "agree to become * * * a member of a labor organization" has reference only to a so-called "company union." The legislature could have said "company union" if that was what it meant. But it said "labor organization." The majority opinion holds that our statute is simply an "anti-yellow-dog contract" statute. But the "anti-yellow-dog" part of the statute makes it unlawful to cause the employee to "agree not to become * * * a member of *a labor organization.*" If an employer cannot lawfully forbid membership in *a labor organization,* the whole "yellow dog" feature vanishes into thin air if that labor organization is simply *a company union.* Union labor would be afforded no protection by the outlawing of contracts whereunder an employee could not be a member of a company union. Precisely the same term, namely, "labor organization," is used in both clauses—the clause outlawing an insistence on membership and the clause outlawing an insistence on nonmembership. Certainly "labor organization" cannot have been intended by the legislature to refer to a labor union in part of the sentence and to refer to a company union in another part of the same sentence. The title to sec. 10473, N.C.L. is aptly and properly worded by the codifier: "Agreement to Join or Not to Join Labor Organization Unlawful, When." Instead of treating this statute simply as a nondiscrimination statute, which it appears to me most clearly to be, we now have a statute which is not even an "anti-yellow-dog contract" statute. It is nothing at all. It now simply means that an employee cannot be compelled to be a member of a company union and that he cannot be compelled not to be a member of a company union.

The majority opinion denying rehearing relies

strongly on Baker Community Hotel Co. v. Hotel & Restaurant Employees, etc., Or., 207 P.2d 1129. That case, however, simply held that an attempt to unionize the plant constituted a labor dispute within the conception of the Oregon statute and that peaceful picketing to accomplish such objective could accordingly not be enjoined. It does not touch upon our present problem.

The majority opinion states that City of Reno v. Second Judicial District Court and other cases "upheld the lawfulness of peaceful picketing as a proper and legitimate labor *objective.*" (Emphasis added.) With due respect to that opinion, such conclusion is inaccurate. Peaceful picketing as a *means* or as an *activity* has of course been held to be free from restraint subject to various conditions, one of which is the lawfulness, under state laws, of *its* objective. It has never, so far as I know, and certainly not in City of Reno v. Second Judicial District Court, been upheld as an objective in itself.

Feeling, as I do, that the majority opinion supporting the order denying the petition for rehearing leaves the matter in greater confusion than ever, I think a rehearing should be granted.