**AMALGAMATED ASSOCIATION OF STREET, ELECTRIC RAILWAY AND MOTOR COACH EMPLOYEES, DIVISION 1225, Plaintiff,**

v.

**LAS VEGAS–TONOPAH–RENO STAGE LINE, INC., Defendant.**

Civ. No. 1506.

United States District Court
D. Nevada.

Jan. 12, 1962.

Neyhart & Grodin, San Francisco, Cal., Roger Bissett, Reno, Nev., for plaintiff.

John H. McNamee, Las Vegas, Nev., Ernest S. Brown, Reno, Nev., for defendant.

ROSS, Chief Judge.

## ORDER DISMISSING ACTION, DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT, AND GRANTING SUMMARY JUDGMENT FOR DEFENDANT

### I. PRELIMINARY MATTERS

This is an action brought by plaintiff union against defendant employer under Section 301 of the Labor Management Relations Act, 29 U.S.C.A. § 185. The complaint alleges that on or about October 12, 1959, the parties entered into a written collective bargaining agreement and that one of the provisions therein provided for the so-called "agency shop." The relevant portions of that agreement are set forth in the margin.[1] Plaintiff then alleges that defendant has refused to enforce the agency shop provisions on the ground that said provisions are unlawful. Accordingly, the Court is ask-

---

[1] "(c) In accordance with the policy set forth under subparagraphs (a) [which provides that membership in a union is not compulsory] and (b) [which provides that, since all employees equally benefit from the union's exclusive representation, all employees should assume their 'fair share' of the burdens] of this Article, all employees shall, as a condition of continued employment, pay to the Union, the employee's exclusive collective bargaining representative, an amount of money equal to that paid by other employees in the bargaining unit who are members of the Union, which shall be limited to an amount of money equal to the Union's regular and usual initiation fees, and its regular and usual dues and its general and uniform assessments. For existing employees, such payments shall commence thirty (30) days following the date of execution of this Agreement and for new employees, the payments shall start thirty (30) days following the date of employment."

ed to grant declaratory judgment to the effect that the provisions are valid and enforceable and to issue an injunction restraining further breach of the provisions by the defendant. Defendant has admitted all of the allegations of the complaint, but has alleged by way of affirmative defense the contentions that the agency shop provisions contravene the Nevada Right to Work Law, N.R.S. secs. 613.230–613.300, and are also unlawful under Section 8(a) and (b) of the Labor Management Relations Act, 29 U.S.C.A. § 158(a) and (b).

The parties have filed cross-motions for summary judgment. Both plaintiff and defendant assert that there are no genuine issues as to any material facts and that there remains only a question of law. After careful examination of the entire record, we have come to the same conclusion.

## II. THE AGENCY SHOP AND SECTION 14(b)

■ For reasons to be set out presently, we conclude that an agency-shop agreement is not valid under Nevada law. Preliminarily, however, we must first determine whether, bearing in mind the recurring notions of federal preemption of the field of labor legislation, a State has the power to ban the agency shop.

We commence our analysis by considering the law as found in Section 8(a) (3) of the Taft-Hartley Act, 29 U.S.C.A. § 158(a) (3), and in Section 8(b) (2) of the Act, 29 U.S.C.A. § 158(b) (2). These provisions "were designed to allow employees to freely exercise their right to join unions, be good, bad, or indifferent members, or abstain from joining any union without imperiling their livelihood." Radio Officers' Union, etc. v. N. L. R. B., 347 U.S. 17, 40, 74 S.Ct. 323, 335, 98 L.Ed. 455 (1954). The Congress, however, chose to limit the rights of the individual workingman by inserting a proviso to Section 8(a) (3). That proviso gave federal sanction to the so-called union shop, assuming that the requirements found in the proviso were met. Thus, if the statutory conditions precedent were met, an employer and a union may "require as a condition of employment membership" in the union by all employees in the bargaining unit thirty days after their employment or after the effective date of the agreement, whichever is later. But, the proviso to Section 8(a) (3) did not constitute a wholly unrestricted venture into compulsory unionism, for Congress also enacted Section 14 (b), 29 U.S.C.A. § 164(b), which has the effect of giving congressional sanction to the duly enacted right-to-work laws of the several States.

■■ It is obvious, of course, that if we were to read Section 14(b) literally, the states would only have the power to prohibit agreements which require "membership" in a union as a condition of employment.[2] But, as the Supreme Court has indicated on numerous occasions, we need not be bound by the strict letter of a statute if, by doing so, we would defeat the congressional purpose or create an absurd result.[3] In order to avoid either of those two consequences,

2. Section 14(b) provides:
"Nothing in this subchapter shall be construed as authorizing the execution or application of agreements requiring membership in a labor organization as a condition of employment in any State or Territory in which such execution or application is prohibited by State or Territorial law."

3. See e. g., Mastro Plastics Corp. v. N. L. R. B., 350 U.S. 270, 285, 76 S.Ct. 349, 359, 100 L.Ed. 309 (1956) (" 'In expounding a statute, we must not be guided by a single sentence or member of a sentence, but look to the provisions of the whole law, and to its object and policy.' "); International Longshoremen's & Warehousemen's Union v. Juneau Spruce Corp., 342 U.S. 237, 243, 72 S.Ct. 235, 239, 96 L.Ed. 275 (1952) ("But literalness is no sure touchstone of legislative purpose. The purpose here is more closely approximated, we believe, by giving the historic phrase a looser, more liberal meaning in the special context of this legislation."); United States v. Bryan, 339 U.S. 323, 338, 70 S.Ct. 724, 734, 94 L.Ed. 884 (1950) ("Despite the fact that the literal language would

we may properly rely on legislative history. United States v. Public Utilities Commission, 345 U.S. 295, 315, 73 S.Ct. 706, 718, 97 L.Ed. 1020 (1953) ("Where the words are ambiguous, the judiciary may properly use the legislative history to reach a conclusion. And that method of determining congressional purpose is likewise applicable when the literal words would bring about an end completely at variance with the purpose of the statute."); Harrison v. Northern Trust Co., 317 U.S. 476, 479, 63 S.Ct. 361, 363, 87 L.Ed. 407 (1943) ("But words are inexact tools at best and for that reason there is wisely no rule of law forbidding resort to explanatory legislative history no matter how 'clear the words may appear on "superficial examination." ' "); Takao Ozawa v. United States, note 3 supra. It

is our purpose to demonstrate that a literal construction of Section 14(b) would frustrate the very purpose for which it was enacted and would create a patently absurd result.

If we compare the language of the proviso to Section 8(a) (3) with the provisions of Section 14(b), we see that the latter section gives to the states the power to render inoperative the proviso to the former section. This much is made clear not only by a reading of the two sections, but by the leading case of Algoma Plywood & Veneer Co. v. Wisconsin Employment Relations Board, 336 U.S. 301, 313–315, 69 S.Ct. 584, 93 L.Ed. 691 (1949), and by the congressional history which is set forth in note 11 infra.

What, then, was it that was provided for by federal law, but which could be

[produce a given result], the court will not reach that result if it is contrary to the congressional intent and leads to absurd conclusions."); United States v. Brown, 333 U.S. 18, 27, 68 S.Ct. 376, 381, 92 L.Ed. 442 (1948) ("No rule of construction necessitates our acceptance of an interpretation resulting in patently absurd consequences."); Sorrells v. United States, 287 U.S. 435, 446, 53 S.Ct. 210, 214, 77 L.Ed. 413 (1932) (per Mr. Chief Justice Hughes: "Literal interpretation of statutes at the expense of the reason of the law and producing absurd consequences or flagrant injustice has frequently been condemned."); Fleischmann Construction Co. v. United States to Use of G. W. Forsberg, 270 U.S. 349, 360, 46 S.Ct. 284, 289, 70 L. Ed. 624 (1926) ("The strict letter of an act must, however, yield to its evident spirit and purpose, when this is necessary to give effect to the intent of Congress. [citations omitted] And unjust or absurd consequences are, if possible, to be avoided."); Takao Ozawa v. United States, 260 U.S. 178, 194, 43 S.Ct. 65, 67 L.Ed. 199 (1922) ("It is the duty of this Court to give effect to the intent of Congress. Primarily this intent is ascertained by giving the words their natural significance, but if this leads to an unreasonable result plainly at variance with the policy of the legislation as a whole, we must examine the matter further. We may then look to the reason of the enactment and inquire into its antecedent history and give it effect in accordance with its design and purpose,

sacrificing, if necessary, the literal meaning in order that the purpose may not fail.").

See also Johansen v. United States, 343 U.S. 427, 431, 72 S.Ct. 849, 96 L.Ed. 1051 (1952). And see Johnson v. United States, 163 F. 30, 32, 18 L.R.A.,N.S., 1194 (1st Cir., 1908) (where Mr. Justice Holmes, sitting as Circuit Justice said: "The Legislature has the power to decide what the policy of the law shall be, and if it has intimated its will, however indirectly, that will should be recognized and obeyed. The major premise of the conclusion expressed in a statute, the change of policy that induces the enactment, may not be set out in terms, but it is not an adequate discharge of duty for courts to say: We see what you are driving at, but you have not said it, and therefore we shall go on as before.").

See also United States v. Babbit, 1 Black 55, 61, 66 U.S. 55, 61, 17 L.Ed. 94 (1861) ("What is implied in a statute * * * is as much a part of it as what is expressed. [citations omitted] 'A thing within the intention of the makers of the statute is as much within the statute as if it were within the letter.' "); United States v. Freeman, 3 How. 556, 565, 44 U.S. 556, 565, 11 L. Ed. 724 (1845) (" * * * the rule, that the meaning of the legislature may be extended beyond the precise words used in the law, from the reason or motive upon which the legislature proceeded, from the end in view, or the purpose which was designed * * * ").

done-away with by state law? The proviso to Section 8(a) (3) literally only sanctions "membership" in a union. What does this mean to the workingman? It only means that he must pay to his union an initiation fee and dues. He cannot be discharged by his employer for any other reason than failure to pay those two items.

This is the rule declared by the Supreme Court. In the leading case of Radio Officers' Union, etc., v. N. L. R. B., supra, 347 U.S. at 41, 74 S.Ct. at 336, the Court stated:

"This legislative history clearly indicates that Congress intended to prevent utilization of union security agreements for *any purpose other than to compel payment of union dues and fees*. Thus Congress recognized the validity of unions' concern about 'free riders,' *i. e.*, employees who receive the benefits of union representation but are unwilling to contribute their share of *financial support* to such union, and gave unions the power to contract to meet that problem while withholding from unions the power to cause the discharge of employees for any other reason" (Emphasis added).

The identical conclusion had been reached earlier by the Court of Appeals for the Seventh Circuit. Union Starch & Refining Co. v. N. L. R. B., 186 F.2d 1008, 1012–1013, 27 A.L.R.2d 629 (7th Cir., 1951). The history of the Taft-Hartley Act is replete with support of this construction.[4]

4. House Report No. 245, 80th Cong., 1st Sess., 1947, contains these pertinent passages. At page 9: "An employee may be expelled from the union and thus forced to leave his job only if the expulsion is by reason of his failing to pay fees and dues imposed upon employees generally." At page 32: "In brief, a union may deny membership to an employee upon any ground it wishes, but the only ground on which it can have him discharged under a 'union security' clause is nonpayment of initiation fees and dues * * *." At page 34: "As we have seen, unions may require employers to discharge employees under such [union shop and maintenance of membership] agreements only when the union suspends or expels the employees for nonpayment of initiation fees or of dues."

The following is found in Sen. Report No. 105, 80th Cong., 1st Sess., 7 (1947): "[E]xpulsion from the union cannot be a ground of compulsory discharge if the worker is not delinquent in paying his initiation fees or dues * * *."

Attached to the Senate Report was a statement of the minority views of certain of the committee members. It is exceptionally enlightening, for it highlights the limited significance of the union-shop agreement which is sanctioned by the proviso to Section 8(a) (3). The minority report states at page 9:

"Even under a union-security contract which this bill permits, an employee could with impunity completely defy the union. He could defame it, he could betray confidential union information, he could seek to wreck it, attempt to bring it into disrepute, act as a spy or stoolpigeon or strikebreaker, be a racketeer or a grafter, and yet the union would have no effective sanction against him. If he pays or offers to pay his dues and initiation fees, the employer need not fire him and any attempt by the union to persuade the employer to do so would be an unfair labor practice on the part of the union. The union would be completely shorn of effective power to discipline its members for good cause."

Almost identical language is found in the minority report of the House Committee at pages 80–81.

Important, too, is the following colloquy, involving Senator Ball, one of the managers of the Taft-Hartley Act.

"Mr. BALL. Absolutely not. If the union expels a member of the union for any other reason than nonpayment of dues, and there is a union-shop contract, the union cannot under that contract require the employer to discharge the man from his job. It can expel him from the union at any time it wishes to do so, and for any reason.

"Mr. PEPPER. And the union can admit to membership anyone it wishes to admit, and decline to admit anyone it does not wish to accept.

"Mr. BALL. That is correct. But the union cannot, by declining membership for any other reason than nonpayment of dues, thereby deprive the individual of the right to continue in his job. In other words, it cannot force the employer to discharge him." 93 Cong.Rec. 4272 (April 30, 1947).

Thus, in a state which has not prohibited compulsory unionism, an employee, if his employer has signed a union-shop contract, may avoid being discharged from employment at the instance of the union as long as he pays his initiation fees and dues. We submit that the employee is in precisely the same position when his employer has, as in the case at bar, signed an agency-shop agreement. Here, too, the employee is secure in his work as long as he pays his initiation fee and dues.

Is there *any* difference between the union shop, under the Taft-Hartley Act, and the agency shop? It is clear, from a reading of the Union Starch case, supra, that, even if there is a union-shop agreement, the employee need not actually become *a member* in order to insulate his job from the efforts of the union. In that case, the employee was informed "that in order to join the Union it was necessary to pay dues and an initiation fee, file an application card, attend the next meeting of the Union, * * * and take an oath of loyalty to the Union." 186 F.2d at 1010. The employee tendered his initiation fee and dues, but "the tender was rejected on the ground that [he] had not fulfilled other union-imposed conditions of membership." Ibid. The employee was discharged by his employer "because they were non-members of the Union, not on the ground that they had not tendered dues and initiation fees, but because they had failed to file an application card, attend a meeting of and take an oath of loyalty to the Union." 186 F.2d at 1011. The N. L. R. B. concluded that "if a union 'imposes *any* other qualifications and conditions for membership with which he is unwilling to comply [*i. e.*, qualifications other than payment of initiation fee and dues], such an employee may not be entitled to membership but he is entitled to keep his job.'" 186 F.2d at 1011, emphasis added. The Court of Appeals enforced the Board's order which provided for reinstatement as an employee and for recovery of loss of pay.

Union Starch was, we believe, decided in complete harmony with the Act. Although it only holds that an employee may retain his job if the union refuses membership for any other reason than failure to pay initiation fee and dues, the *ratio decidendi* of the opinion can yield to no other conclusion than that an employee is also protected if he refuses to join the union as long as he is willing to pay his dues. Our conclusion is clearly supported by that portion of the previously-quoted statement of the Supreme Court that "Congress intended to prevent utilization of union security agreements for any purpose other than to compel payment of union dues and fees." Radio Officers' Union, etc. v. N. L. R. B., supra, 347 U.S. at 41, 74 S.Ct. at 336. As long as a union-shop agreement under the Act only means that a union may secure from an employee an initiation fee and dues, what difference does it make whether the union refuses to admit the employee to membership or whether the employee refuses to join the union, as long as he pays his money? Absolutely no difference exists. We reject the distinction suggested in Jones, "The Agency Shop," 10 Labor Law Journal 781, 787 (1959). There the author argued that under a union-shop contract, unlike an agency-shop contract, "one must go through the process of joining a union, even if the membership application is rejected by the union." What in the world is the magic in having to sign an application card? Even if it is accepted, the union cannot require the "member" to do anything but pay his money. He cannot be required to take an oath or attend meetings. He is free to do all the "terrible" things that were feared by the gentlemen who wrote the minority reports to the Taft-Hartley Act, the relevant portions of which appear in note 4 supra. If a union is certified as exclusive bargaining representative, even a non-member could not bargain for himself. He would be bound by the agreement negotiated by the union. In short, the only benefit that the union could gain from forcing the employee to join, aside

from financial support, would be the ability to point to the fact that its membership roll had increased. But, that benefit to the union from compulsory membership is one which need not concern this Court. As is made clear from the opinion in the Radio Officers' case, supra, Congress was motivated to enact the proviso to Section 8(a) (3) not out of desire to give unions the right to enhance their prestige, but out of concern about "employees who receive the benefits of union representation but are unwilling to contribute their share of *financial support* to such union * * *." 347 U.S. at 41, 74 S.Ct. at 336, emphasis added.

We are convinced that, under the Taft-Hartley Act, there is no meaningful distinction between the type of union security which is provided for in the proviso to Section 8(a) (3) and the union security which is provided for in the agency-shop contract at bar. Any distinction which does exist is purely a matter of form, and in light of the wise exhortations of the Supreme Court, "it is the substance, not the form, which should be our concern." United States v. New York, New Haven & Hartford R. R. Co., 355 U.S. 253, 263, 78 S.Ct. 212, 218, 2 L.Ed.2d 247 (1957).

Although it is true that Section 14(b) literally only gives the states the right to outlaw agreements which make "membership" in a union compulsory, we are convinced that we would be frustrating the clear congressional purpose and creating an utterly absurd result if we were to hold that literalness should be exalted to a point where the states were denied the right to ban the agency shop as well. Section 14(b) would be bereft of meaning if we were to construe it in a fashion which would render the states powerless to make illegal that type of union security agreement which imposes liabilities on the workingman which, realistically, are the same liabilities which, under the section, the states may remove.

Substantial evidence that Congress did not intend to authorize the agency shop in states which had passed right-to-work laws is to be found in the legislative history of the Labor-Management Reporting and Disclosure Act of 1959, Public Law 86–257, 73 Stat. 519. Section 302 of the Taft-Hartley Act, 29 U.S.C.A. § 186, made it unlawful for an employer to pay or to deliver to a representative of his employees "any money or other thing of value," and, likewise, made it unlawful for a representative of his employees to receive or accept same. There was, however, an exception to this general prohibition. Section 302(c) (4) of the Act, 29 U.S.C.A. § 186(c) (4), sanctioned payment by an employer and receipt by a union of "money deducted from the wages of employees *in payment of membership dues* in a labor organization: *Provided,* That the employer has received from each employee, on whose account such deductions are made, a written assignment which shall not be irrevocable for a period of more than one year, or beyond the termination date of the applicable collective agreement, whichever occurs sooner." (Emphasis added). This subsection, therefore, gave sanction to the voluntary checkoff of union dues.

On January 20, 1959, the so-called Kennedy-Ervin bill (S. 505) was introduced in the Senate and referred to the Committee on Labor and Public Welfare. Section 112 of that bill made certain amendments to Section 302 of the Taft-Hartley Act. Section 302(c) (4) was proposed to be amended so that it would exempt from the general prohibitions of Section 302 "money deducted from the wages of employees in payment of *membership dues* in or periodic payments to a labor organization," provided that there were a written assignment. I Legislative History of the Labor-Management Reporting and Disclosure Act of 1959, 52 (1959) (Emphasis added.)

Senate Report No. 187, 86th Cong., 1st. Sess. (1959), U.S.Code Congressional and Administrative News, 1959, p. 2318, retained this proposed amendment to Section 302, but modified it so that it sanctioned "money deducted from the wages of employees in payment of *membership dues* in *or other periodic payments* to a labor organization *in lieu thereof,*" pro-

vided that there were a written assignment. I Legislative History, etc., 363 (Emphasis added). Senate Bill 1555, which was approved by the Senate on April 26, 1959, contained the precise language adopted earlier by the Senate Committee. I Legislative History, etc., 543.

The potential impact of the language chosen by the Senate did not go unnoticed. On May 7, 1959, Senator Barry Goldwater, ranking minority member of the Senate committee, inserted in the Congressional Record his analysis of what he termed the "major deficiencies in the labor reform bill" which had but recently passed the upper chamber. See 105 Cong.Rec. 6848 (daily ed. May 7, 1959), II Legislative History, etc., 1271, where the Senator stated:

"5. The bill permits the checkoff of fees paid in lieu of dues to a labor union. This tacitly recognizes that the so-called agency shop is lawful. The agency shop is a device now being used in an attempt to circumvent the right-to-work laws in several states, by requiring a periodic payment to the union for its services as collective bargaining agent without requiring the employee to join the union. Its effect, in practical terms, is exactly equivalent to what is now permitted by way of union security under the Taft-Hartley Act, but which it was the intention of Congress to permit the States to prohibit."

On June 3, 1959, Senator Goldwater appeared before the House Committee on Education and Labor, at which time he presented his "reasons for [his] vote against [the Senate bill] and some suggestions in regard to how [he felt] the bill might be improved." He made to the House committee virtually the identical remarks that he had made earlier to the Senate. 105 Cong.Rec. 9113 (daily ed. June 8, 1959), II Legislative History, etc., 1285. He went on to inform the Committee that:

"In another section the [Senate] bill would tighten the hold of compulsory unionism on the Nation by recognizing as legitimate a practice which has come to be known as the agency shop. * * * This practice is being utilized increasingly in right-to-work States to achieve the equivalent of the type of union-security arrangement which is permitted under the Taft-Hartley Act but which it was the intention of Congress in that statute to authorize the States to prohibit if they so wished." Hearings, Joint Subcommittee of the House, Committee on Education and Labor, 86th Cong., 1st. Sess., on H.R. 3540, H.R. 3302, H.R. 4473, H.R. 4474 and related bills regarding labor-management reform legislation, part 4, at page 1628 (1959).

The contentions of the Senator apparently were heeded by the House Committee. House Bill 8342, which was reported out of the Committee on July 30, 1959, did, in Section 505 thereof, amend Section 302 of the Taft-Hartley Act; but, it is most significant that the committee bill did *not* incorporate the Senate's language with reference to "other periodic payments * * * in lieu" of membership dues. I Legislative History, etc., 739. The Committee's bill was amended in substantial portions, but H.R. 8342, as amended and as approved by the House on August 14, 1959, left untouched the original language in Section 302(c) (4) of the Taft-Hartley Act. 105 Cong. Rec. 14538 (daily ed. August 14, 1959), II Legislative History, etc., 1699.

The Senate and House bills went to Conference Committee. Senator Goldwater was appointed as a Senate conferee (105 Cong.Rec. 14608) (daily ed., August 17, 1959), II Legislative History, etc., 1351), and the Conference approved and the Congress adopted what is now Public Law 86–257, Section 505 of which followed the House language instead of that of the Senate with respect to amending Section 302(c) (4) of the Taft-Hartley Act. Thus, the Congress rejected language which, as Senator Goldwater pointed out, would have given tacit con-

gressional sanction to the agency shop in states which had adopted laws prohibiting compulsory union membership.

■ In interpreting an Act of Congress, the federal courts have not uncommonly drawn on the fact that proposals to amend the Act in question were rejected by the Congress. See, e. g., Norwegian Nitrogen Products Co. v. United States, 288 U.S. 294, 306, 53 S.Ct. 350, 77 L.Ed. 796 (1933); United States v. Pfitsch, 256 U.S. 547, 551, 41 S.Ct. 569, 65 L.Ed. 1084 (1921); Madden v. Brotherhood and Union of Transit Employees, 147 F.2d 439, 443, 158 A.L.R. 1330 (4th Cir. 1945) ("In 1937 legislation was proposed before Congress, which would have amended the National Labor Relations Act * * *, and the fact that such legislation was never enacted throws further light upon the legislative intent."). The question, of course, is why the Congress rejected the language found in the Kennedy-Ervin bill. To answer this question, the "statements by a witness urging an amendment to the proposed bill in order to remedy a certain evil that would arise thereunder should be admitted as evidence of the legislative intent where the amendment was adopted." 2 Sutherland, Statutory Construction, 491 (Horack ed., 1943). The federal courts have frequently resorted to this device to ascertain congressional intent. See, e. g., United States v. Public Utilities Commission, 345 U.S. 295, 302 (n. 6), 305 (n. 10), 308 (nn. 14 and 15), 313 (n. 23), 73 S.Ct. 706, 97 L.Ed. 1020 (1953); United States v. Henning, 344 U.S. 66, 72, n. 14, 73 S.Ct. 114, 97 L.Ed. 101 (1952); United States v. American Trucking Associations, Inc., 310 U.S. 534, 548, 60 S.Ct. 1059, 84 L.Ed. 1345 (1940); S. E. C. v. Robert Collier & Co., Inc., 76 F.2d 939, 941 (2d Cir., 1935).

We have already noted that it was Senator Goldwater who brought to the attention of the House Committee the reasons for not allowing even a voluntary check-off of monies paid in lieu of union dues. Since there is, to our knowledge, no other indicia of legislative history which would explain why the Congress

approved the position of the Senator, we would, in our opinion, be blinding ourselves to reality if we were to hold that there was any other intent than that which may be gathered from the Senator's statements. Clearly, the Congress was aware of what it was doing when it deleted those portions of the Kennedy-Ervin bill which would have permitted the check-off of payments made under an agency-shop agreement. Senator Goldwater pointed out to the Senate the crucial difference in approach between the Senate and House bills, 105 Cong.Rec. 15120 (daily ed. August 20, 1959), II Legislative History, etc., 1360, and Senator Morse, a Senate Conferee, explicitly pointed out that:

> "The conference committee bill omits, however, the provision which is contained in the Kennedy-Ervin bill authorizing the checkoff of periodic payments in lieu of membership dues under so-called agency shops." 105 Cong.Rec. 16389 (daily ed. September 3, 1959), II Legislative History, etc., 1418.

We are, therefore, of the opinion that the legislative history of the Labor-Management Reporting and Disclosure Act of 1959 makes clear that Congress wanted to do nothing which would lend weight to any argument that it was willing to sanction the agency shop in states which had enacted right-to-work legislation. Furthermore, the actions of Congress in 1959 accord at least inferential support to the contention that Congress, in 1947, was of a mind to allow the states to ban what, under the federal statute, is realistically the equivalent of the union shop—the agency shop.

We are, to our knowledge, the first federal court which has dealt with the problem of whether or not Section 14(b) gives to the states the power to prohibit the agency shop. There is, however, a decision of one state supreme court on this matter. That court ruled, as do we, that the states do have the power. Higgins v. Cardinal Mfg. Co., Inc., 188 Kan. 11, 360 P.2d 456, 467–469 (1961). On October 12, 1961, the Supreme Court denied cer-

[redacted]

tiorari, General Drivers Allied Automotive and Petroleum, etc. v. Higgins, 368 U.S. 829, 82 S.Ct. 51, 7 L.Ed.2d 32 (1961).

We hold that, by virtue of Section 14 (b) of the Labor-Management Relations Act, 29 U.S.C.A. § 164(b), the states may prohibit and render illegal a provision of a collective bargaining agreement which requires that, as a condition of continued employment, an employee, even though he does not join the union, must pay to the union a sum of money equivalent to an initiation fee and periodic payments in lieu of union dues.

## III. THE AGENCY SHOP UNDER NEVADA LAW

The Nevada right-to-work law, which was approved by the voters at the general election of November, 1952, became the law of the state upon the completion of the canvass of votes of that election. Attorney General Opinion No. 22 (Foley, March 16, 1959). The law is found at NRS 613.230–613.300. NRS 613.250 contains this important language:

> "No person shall be denied the opportunity to obtain or retain employment because of nonmembership in a labor organization, nor shall the state, or any subdivision thereof or any corporation, individual or association of any kind enter into any agreement, written or oral, which excludes any person from employment or continuation of employment because of nonmembership in a labor organization."

Again, we are faced with a situation where, if we were to construe the statute literally, we could not say that Nevada has prohibited the agency-shop agreement. But, as is the practice of the federal courts, see note 3 supra, the Supreme Court of Nevada has held that where the literal interpretation would lead to an absurd result or defeat the clear purpose of the lawmakers, we are not to be bound thereby.[5]

There are two main reasons why we are of the opinion that the lawmakers, here, the voters, intended to prohibit the agency-shop as well as the union shop.

[redacted] First. It is clear, from our previous analysis, that, under the Taft-Hartley Act, the only obligation of an employee, who is covered by a union-shop agreement, is to pay an initiation fee and dues. That duty, we have noted, is the same duty as is incumbent upon an employee who is bound by an agency-shop agreement. Thus, there is no meaningful distinction between the two types of union-security provisions under the Taft-Hartley Act. It would have been an idle act for the people to prohibit only compulsory union membership, for if the agency-shop agreement were left valid,

5. In Orr Ditch & Water Co. v. Justice Court, 64 Nev. 138, 173–174, 178 P. 2d 558, 575 (1947), the Court stated:

> "'Since the intention of the legislature constitutes the law of its enactments, it is the intention rather than the literal meaning of the statute which controls; or, as is generally said, the spirit of the statute will prevail over the strict letter. Consequently, cases which do not come within the strict letter of the statute, if within the spirit, will fall within the scope of the statute * * *. But this principle is not applicable if the statute is clear and unambiguous, so that there is no doubt concerning the legislative intent. Numerous factors may, however, raise such a doubt. It may be raised where a literal meaning leads to absurdity, contradiction, or any other effect which is contrary to the legitimate objects of legislation. As a result, the court may consider the spirit and reason of a statute where a literal meaning would lead to absurdity, contradiction, injustice, or would defeat the clear purpose of the lawmakers.'"

See also State ex rel. O'Meara v. Ross, 20 Nev. 61, 63, 14 P. 827, 828 (1887) ("The leading rule for the construction of statutes is to ascertain the intention of the legislature in enacting the statute, and the intent, when ascertained, will prevail over the literal sense."); Cf., In re McGregor, 56 Nev. 407, 412, 48 P.2d 418, 55 P.2d 10, 12 (1936) ("It is a cardinal rule of construction that a statute should be construed so as to give effect, if possible, to all its parts. [Citation omitted.] And to effect this it is often necessary to restrict or extend the ordinary and usual meaning of words.").

the employee would be in the same position he was in before the right-to-work law was passed.[6] We cannot assume that the voters were aiming only at the form of the evil they saw, but did not, at the same time, intend to eliminate its substance.

■ Second. "In determining the meaning of legislation enacted through initiative or referendum, the courts will look to the published arguments made in connection with the vote upon such measures." 2 Sutherland, op. cit. supra, at 507; People v. Knowles, 35 Cal.2d 175, 217 P.2d 1, 5 (1950); People v. Fowler, 32 Cal.App.2d Supp. 737, 84 P.2d 326, 330 (1938); Eugene School Dist. No. 4 v. Fisk, 159 Or. 245, 79 P.2d 262, 267

(1938). The opponents of the Nevada right-to-work law were unsuccessful in their attempts to repeal the law in the general elections of November 1954 and November 1956. It is clear, from the arguments advanced by the unions, that they were desirous of repeal of legislation which they interpreted as making impossible the compulsory payment of financial support.[7] The unions advanced the same "free-rider" argument which the Supreme Court has indicated motivated Congress to enact the proviso to Section 8(a) (3) of the Taft-Hartley Act. Radio Officers' Union, etc. v. N. L. R. B., supra, 347 U.S. at 141, 74 S.Ct. 323, 98 L. Ed. 455. We question neither the sincerity nor the accuracy of the interpretation

6. In order to determine the intent of the lawmakers, it is permissible to consider the condition of the law before the enactment of the new legislation, State ex rel. O'Meara v. Ross, supra, 20 Nev. at 63, 14 P. 827, and even in the case of laws passed in an initiative or referendum, we may presume that the voters were aware of these historical facts, as well as the opposing theories relating to the subject matter of the proposed law. Anthony v. Veatch, 189 Or. 462, 220 P. 2d 493, 508, 221 P.2d 575 (1950).

7. The following is typical of material which was published in opposition to the Nevada right-to-work law:

From an editorial entitled "What About Our Right to Work?" as it appeared in the "Nevada Citizen," page 2 (June 19, 1954) (the tabloid describes itself as the "official organ, Nevada State Federation of Labor and Clark County Central Labor Council"):

"This means, of course, that no union can ask for and no employer can grant any form of union security in an agreement. The law guarantees free riders the right to work in union shops with full union benefits."

From an editorial entitled "The right to Work—FRAUD," as it appeared in "Engineers' News," page 2 (February, 1956) (the tabloid is published by Local Union No. 3 of the Int. Union of Operating Engineers, Northern Californa, Northern Nevada and Utah):

"The way the law works is this: * * * but the union cannot sign a contract which requires all the workers in the unit to join and pay dues to the union which represents them.

"At the same time, however, the union cannot, by law, refuse to represent the persons who don't pay dues or belong to the union. In other words, the law makes it illegal for the union to demand support from all workers to the union but also makes it illegal for the union not to handle grievances and win improvements for those who refuse to join the union.

"WOULD LEAD TO ANARCHY

"Translate this set-up to our form of government and this is what you'd have:

"States where, say, most people are Democrats and they control the government, the Republicans would not be required to pay taxes or obey the laws passed by the state government, yet the government would have to give them all the services of government. * * *"

From a satire on a conversation between a personnel manager and a man seeking work, entitled "A Short, Short Story from a 'Right to Work' State," as it appeared in the "Nevada Citizen," page 1 (August 27, 1955): "It means you have the right NOT to belong to a union and let the union goons make you pay dues."

The proponents of right-to-work laws have recognized the "free-rider" argument which has been advanced by those opposing the legislation. See the paid advertisement sponsored by the Nevada Federation of Labor and others, appearing in the "Reno Evening Gazette," page 20 (October 29, 1954) (quoting from a proponent's letter to the editor). And see generally "Industry's View," page 4 (January, 1955) (published by the National Association of Manufacturers).

placed upon the Nevada right-to-work statute by its opponents. Since, in spite of that interpretation, the people have retained the law, we think it fair to conclude that it is evidence of the intention of the people to make unlawful that union-security device which makes mandatory the payment of financial support to the union.

We are heartened by the fact that in Attorney General Opinion No. 407 (Dickerson, September 22, 1958), the Attorney General of Nevada unequivocally held that the insertion of an agency-shop provision in a collective bargaining agreement violates the right-to-work statute of this state.[8] The opinion of the Nevada Attorney General has a two-fold significance.

First. The Nevada courts will give weight to a construction of a statute by the executive department. See Seaborn v. Wingfield, 56 Nev. 260, 48 P.2d 881, 884 (1935); State ex rel. Kendall v. Cole, 38 Nev. 215, 148 P. 551, 553 (1915); State ex rel. Springmeyer v. Brodigan, 35 Nev. 35, 126 P. 680, 682

(1912); State ex rel. Cardwell v. Glenn, 18 Nev. 34, 1 P. 186, 191 (1883).

Second. The Attorney General's Opinion was rendered in September of 1958. On February 27, 1959, there was introduced into the Nevada Legislature Assembly Bill No. 359, which bill would have permitted a union shop under circumstances similar to those expressed in the proviso to Section 8(a) (3) of the Taft-Hartley Act.[9] The proposed repeal of the right-to-work law was defeated by almost a two-to-one vote of the members of the Assembly present and voting. We find it difficult to believe that the Legislature was not aware of the construction which had been placed upon the statute by the Attorney General. Its acquiescence, viewed either in terms of refusal to repeal or in failing to amend so as to overrule the executive construction (at a time when the subject of union-security agreements was before it), should not be totally ignored.

In construing the Nevada right-to-work law, we are much impressed by the approach used by the Nevada Supreme Court when it interpreted that statute

---

8. The Attorney General stated in passing: "As we read it [the right-to-work law], the terms thereof spell out a specific mandate which cannot be avoided or circumvented by the imposition of any terms or conditions prerequisite to realizing its benefits. To require nonunion employees, as a condition for their employment under an agreement of this nature, to pay to the union certain sums equal in amount to the dues paid periodically by its members, is, in our opinion, equivalent to assessing them in the same manner and to the same extent and purpose as union employees. This is the very thing that the Act was designed to prevent. It is an elementary rule of law, needing no citation of authorities, that what the law prohibits directly cannot be accomplished indirectly.

"To give effect to an 'Agency Shop' clause embodied in a collective bargaining agreement would render the Right to Work law nugatory."

9. Assembly Bill 359 would have added the following language to NRS 613.250: "2. Nothing in NRS 613.230 to 613.300, inclusive, or in any other statute of

the State of Nevada shall preclude an employer from making and signing an agreement with a labor organization to require, as a condition of employment, membership therein on or after the 31st day following the beginning of such employment or the effective date of such agreement, whichever is later, if such labor organization is the representative of the majority of the employees in the appropriate collective bargaining unit.

3. No employer shall justify termination of employment of any employee for nonmembership in a labor organization if such employer has reasonable grounds for believing that membership in such labor organization was not available to the employee on the same terms and conditions generally applicable to other members or applicants for membership, or, membership was terminated or denied for reasons other than the failure of the employee to tender the initiation fees uniformly required and periodic dues and assessments as a condition of acquiring or retaining membership in such labor organization."

738

in the case of Building Trades Council, etc. v. Bonito, 71 Nev. 84, 280 P.2d 295 (1955). There, the Court held that a hiring-hall provision was invalid under the act, even though the provision did not explicitly say that only union members would be supplied by the union.

10. Foremost of the decisions, of course, is Higgins v. Cardinal Mfg. Co., Inc., 188 Kan. 11, 360 P.2d 456 (1961), certiorari denied General Drivers Allied Automotive and Petroleum, etc. v. Higgins, 368 U.S. 829, 82 S.Ct. 51, 7 L.Ed.2d 32 (1961). See also Arizona Flame Restaurant, Inc. v. Baldwin, 34 LRRM 2707, 2709 (Superior Court, Maricopa County, 1954), affirmed and modified 82 Ariz. 385, 313 P.2d 759 (1957) (the Arizona Supreme Court did not find it necessary to reach the question of whether the agency-shop was unlawful but the trial court, construing Ariz.Rev.Stats. sec. 23-1302 (1956), which is identical to NRS 613.-250, held that that form of union-security was prohibited under Arizona law.); Attorney General Opinion WW-1018 (Texas, 1961) (holding that the agency shop violated the Texas right-to-work law, Vernon's Anno.Rev.Civ.Stats., art. 5207a (1947)).

We are aware of the fact that Meade Electric Co. v. Hagberg, 129 Ind.App. 631, 159 N.E.2d 408 (1959), is to the contrary. However, that case is distinguishable because the Indiana statute is penal in character, and, as the appellate court observed, such fact necessitated a strict construction. 159 N.E.2d at 412.

Plaintiff argues that the same rule of construction should apply to the case at bar, since the right-to-work law (NRS 613.230-613.300) must be read in pari materia with NRS 613.130 which has a penalty provision and which closely parallels the language found in NRS 613.250.

NRS 613.130 had its genesis in Laws, ch. 111 (1903). That law was carried intact to NCL secs. 10473 and 10474. The statute was amended in 1951 by inserting the phrase "be required" for the original phrase "promise or agree," Laws, ch. 95 (1951), and a comprehensive definition of "labor organization" was provided. That statute is substantially different from NRS 613.250.

In State ex rel. Culinary Workers Union, Local No. 226 v. Eighth Judicial District Court, 66 Nev. 166, 178-182, 207 P.2d 990 (1949), the Nevada Supreme Court rejected the idea that NRS 613.130 was comparable to a right-to-work law or that it banned the closed shop or any

Finally, we note that in states which have explicitly prohibited compulsory membership, but which have not explicitly banned the agency shop as well, the weight of decision holds that the latter form of union-security is unlawful under the right-to-work laws.[10]

other form of union-security agreement. After holding that NRS 613.130 would not be interpreted literally and that the legislative intent must be considered (66 Nev. at 178-179, 207 P.2d 990), the Court noted that the statute was aimed at something entirely different than that which was the subject of the right-to-work laws. 66 Nev. at 181, 207 P.2d 990. The Court summed up its attitude with these words:

"From our study of the legislative history and the background of [NRS 613.-130] it is plain to us that this act was enacted to prohibit the 'yellow-dog' type of contract and to protect workers from compulsion to join company dominated unions, but that the law does not by its terms outlaw union security agreements obtained through the process of collective bargaining.

"If the opponents of union security agreements wish to have them declared unlawful they should address their demands to the legislature * * *." 66 Nev. 182, 207 P.2d 997, emphasis added. This opinion, in what later became to be known as the "White Cross Drug Case," was adhered to on petition for rehearing. 66 Nev. 202, 210 P.2d 454 (1949). In denying the petition for rehearing, the Court said this: "said statute, Sec. 10473 [NRS 613.130], was generally considered to be based upon what has been usually designated as a 'yellow dog' or 'company union' contract, and not within the meaning or purview of a 'Right to Work' statute." 66 Nev. 205-206, 210 P.2d 455. Finally, in Jensen v. Reno Central Trades & Labor Council, 68 Nev. 269, 229 P.2d 908 (1951), the Court refused to reconsider the position which it took in the White Cross Drug case.

It is arguable, we recognize, that the 1951 amendment to NRS 613.130, providing for a definition of "labor organization" which is broader than a mere "company union," evidenced a legislative intent which was more far-reaching than that ascertained in the White Cross Drug case. But that is not to say that the Legislature, in 1951, intended to accomplish the same purposes which were intended by the voters in 1952. By adding to the old "yellow dog" statute of

■ We hold that the agency-shop provision of the contract at bar is unlawful under the Nevada right-to-work law.

## IV.  GIVING EFFECT TO THE NEVADA LAW

■ It is quite possible to argue that, by entering into an agency-shop contract, which is prohibited under Nevada law, the plaintiff union had denied employees rights which are guaranteed to them under Section 7 of the Taft-Hartley Act. It is, therefore, arguable that the union has committed an unfair labor practice condemned by Section 8(b) (1).  Similarly, it might well be argued that, by attempting to force the defendant employer to violate Section 8(a) (3) of the Act, the union was also guilty of the unfair labor practice set forth in Section 8(b) (2).

We are aware of the exceptionally broad language used in San Diego Building Trades Council v. Garmon, 359 U.S. 236, 245, 79 S.Ct. 773, 780, 3 L.Ed.2d 775 (1959), that "when an activity is arguably subject to § 7 or § 8 of the Act,

the States as well as the federal courts must defer to the exclusive competence of the National Labor Relations Board if the danger of state interference with national policy is to be averted."

If, under the principle of Garmon, we were to hold that the N. L. R. B. has exclusive jurisdiction we would not be able to grant either party any relief, and thus the complaint would have to be dismissed.  But, preemption a la Garmon would not go so far as to preclude this Court's construing the Nevada statute and determining that the contract provision at bar was illegal under a duly enacted Nevada statute.  Surely, we have not reached a point where the N. L. R. B. is the only body which has, in the first instance, the right to construe state laws.  See Higgins v. Cardinal Mfg. Co., Inc., supra, 360 P.2d at 464.  Accordingly, we are of the opinion that this Court has jurisdiction to determine that Nevada had the power to prohibit the agency shop, that it did so, and that for those reasons we must deny relief to the plaintiff.

1903 a definition of "labor organization" which paralleled that found in the Taft-Hartley Act, the Legislature surely cannot be said to have intended to enact a right-to-work law.  Further evidence that the two laws, NRS 613.130 and NRS 613.250 were viewed by the lawmakers as being different is found in the fact that if they are co-extensive as as a substantive matter, then the people, in 1952, did a useless thing.  It is hard to believe that the bitterness of the election campaigns of 1952, 1954 and 1956 was only over an attempt to add to an existing right-to-work law the right of compensatory damages and injunctive relief in case the law were to be violated, when, in fact, the law already exacted a criminal penalty.

We are of the opinion, therefore, that the two statutes are different in that they were enacted for different purposes. That being true, they are, under Nevada law, just as different as though the language contained in each was dissimilar. Hence, NRS 613.130 and NRS 613.250 are not in pari materia and the strict construction to which the former is entitled need not be applied with respect to the latter.

In any event, even if the two statutes were to be regarded as being in pari materia, that is no reason for giving the right-to-work law a strict construction. In the first place, since the new law is substantially more comprehensive than the older, it is at least arguable that there has been an implied repeal of the penalty provision of the first enactment. After all, the election of 1952 clearly indicated that the lawmakers only intended a civil remedy for violation of the right-to-work law.  Secondly, the Nevada Supreme Court has not, to our knowledge, ruled that a remedial statute, even though it be in pari materia with a penal statute, must also receive a strict construction.  Finally, and most importantly, these matters can await a day when, if ever, the State determines to prosecute under NRS 613.130 on the theory that it was violated by an agency-shop agreement.  This is not a criminal proceeding, and plaintiff has not alleged that it has been threatened with prosecution. There is, therefore, no need to consider the penalty provision which is not, we emphasize, a part of the statute which we have interpreted today.

The foregoing should not be taken in any way as indicating that a court, state or federal, could not, by affirmative action such as an injunction, enforce the state's policy against the agency shop. This much, we believe, is made clear by comparing Local Union No. 10, United Association of Journeymen, Plumbers & Steamfitters, etc. v. Graham, 345 U.S. 192, 73 S.Ct. 585, 97 L.Ed. 946 (1953) (where the Supreme Court upheld a permanent injunction issued by a state court against picketing found to be for a purpose in conflict with the Virginia right-to-work law). Algoma Plywood & Veneer Co. v. Wisconsin Employment Relations Board, 336 U.S. 301, 313–315, 69 S.Ct. 584, 591, 93 L.Ed. 691 (1949) (where the Court noted that the "States are left free to pursue their own more restrictive policies in the matter of union-security agreements," that "§ 14(b) was included to forestall the inference that federal policy was to be exclusive," that Section 14(b) granted to the states "permission * * * to carry out policies inconsistent with the Taft-Hartley Act itself," and that "these provisions can have application, obviously, only where State and federal power are concurrent.") (emphasis added); Higgins v. Cardinal Mfg. Co., Inc., 188 Kan. 11, 360 P.2d 456 (1961), cert. den. General Drivers Allied Automotive and Petroleum, etc. v. Higgins, 368 U.S. 829, 82 S.Ct. 51, 7 L.Ed.2d 32 (1961) (where the Kansas Supreme Court explicitly held that injunctive relief could be had for violation of the state prohibition of the agency shop). The congressional history of Section 14(b) removes any lingering doubt that the states cannot only ban union security agreements but may also enforce the state policy.[11]

## ORDER

It is, therefore,

ORDERED, that plaintiff's motion for summary judgment be, and the same hereby is, denied. It is

FURTHER ORDERED, that the above-entitled action be, and the same hereby is, dismissed. It is

FURTHER ORDERED, that summary judgment be entered in favor of the defendant. It is

FURTHER ORDERED, that defendant shall have its costs herein.

11. The following statements are to be found in House Report No. 245, 80th Cong., 1st Sess. (1947):

"Agreements such as those that section 8(c) (4) [8(a) (3)] permits are valid only if they are valid under the laws of any State in which they are to be performed, and by section 13 [14(b)] the United States expressly declares the subject of compulsory unionism one that *the State may regulate concurrently* with the United States, notwithstanding that the State laws limit compulsory unionism more drastically than does Federal law." at page 34, emphasis added.

"As under the present act, the power of the Board under the amended act in the matter of unfair labor practices is exclusive. This rule has necessitated *a special provision . . . to give to the States a concurrent jurisdiction* in respect of closed-shop and other union-security arrangements." at page 40, emphasis added.

The reference to the exclusive jurisdiction of the N. L. R. B. and the mention of a special provision to give the states "concurrent jurisdiction" can only mean that the states were empowered to *enforce* the policies which they were free to enact under Section 14(b).

Finally we are told in the House Conference Report, H.R.Rep. No. 510, 80th Cong., 1st Sess., 60 (1947):

"It was never the intention of the National Labor Relations Act, as is disclosed by the legislative history of that act, to preempt the field in this regard so as to deprive the States of their powers to prevent compulsory unionism. * * * To make certain that there should be no question about this, Section 13 was included in the House bill. The conference agreement, in section 14(b), contains a provision having the same effect."